## SULLIVAN v. ULRICH.

1. BROKERS—REPRESENTATIONS AS VENDOR'S AGENT.
   The vendor is responsible for any representations to the purchaser made by the real estate agent who acted as the vendor's agent in making the deal.

2. VENDOR AND PURCHASER—FRAUD—TERMITES—KNOWLEDGE OF VENDOR—EVIDENCE.
   In purchaser's action against vendor for damages for fraudulent concealment of infestation of house with termites, evidence clearly preponderated in favor of plaintiffs that defendant knew of the presence of termites and damage to the house by them.

3. FRAUD—DESIGNED PARTIAL STATEMENTS.
   Designed partial statements which deceive, and concealment of facts such as to make those declared partial and misleading, are fraudulent in law.

4. SAME—INNOCENT MISREPRESENTATION OF FACT.
   If there is in fact a misrepresentation, though made innocently, and its deceptive influence was effective, the consequences to the plaintiff being as serious as though it had proceeded from a vicious purpose, plaintiff would have a right of action for the damages caused thereby.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 8 Am Jur, Brokers, § 64; 23 Am Jur, Fraud and Deceit, § 184.
[1, 2] Authority of real estate broker to bind employer by representations to purchaser as to the character or condition of the property. 57 ALR 111.
[3] 23 Am Jur, Fraud and Deceit, § 83.
[4] 23 Am Jur, Fraud and Deceit, § 120.
[5] 23 Am Jur, Fraud and Deceit, § 76 et seq.; 55 Am Jur, Vendor and Purchaser, § 62.
[6] 23 Am Jur, Fraud and Deceit, § 23 et seq.
[7, 8] 23 Am Jur, Fraud and Deceit, § 24.
[8] 55 Am Jur, Vendor and Purchaser, § 61.
[8] Fraud predicated upon vendor's misrepresentation of physical condition of real property. 174 ALR 1010.
[9] 3 Am Jur, Appeal and Error, § 1227.

5. SAME—SUPPRESSION OF A MATERIAL FACT—FALSE IMPRESSION UPON OTHER PARTY.

Fraud may be consummated by suppression of a material fact by either party to a contract of sale, which he is in good faith bound to disclose, as well as by open false assertions, since by such suppression there is fraudulently produced a false impression upon the mind of the other party.

6. SAME—DEFINITION OF REPRESENTATION.

A representation, within the meaning of the law of fraud, is anything short of a warranty, which proceeds from the action or conduct of the party charged, and which is sufficient to create upon the mind a distinct impression of fact conducive to action.

7. SAME—MISREPRESENTATION BY INFERENCE FROM CIRCUMSTANCES.

A misrepresentation need not be express, but may be inferred from circumstances which are in fact equivalent to positive representation.

8. VENDOR AND PURCHASER—FRAUD—TERMITES—EVIDENCE.

In action by purchasers for fraud, evidence preponderated in favor of plaintiffs that upon their specific inquiry from both the vendor and the vendor's real estate agent as to presence of termites, the result of their answers was to convey to plaintiffs that termites were not present, and that such was a misrepresentation.

9. APPEAL AND ERROR—REMAND—DAMAGES.

The Supreme Court may remand a case for the sole purpose of assessment of damages (Court Rule No 72, § 1 [g] [1945]).

REID, J., dissenting.

Appeal from Kent; Brown (William B.), J. Submitted June 10, 1949. (Docket No. 34, Calendar No. 44,445.) Decided December 7, 1949.

Case by Henry C. Sullivan and wife against Mildred R. Ulrich for damages caused by false concealment of fact that house was infested with termites. Judgment for defendant. Plaintiffs appeal. Reversed and remanded for assessment of damages.

*Smith & Smith,* for plaintiffs.

*Bidwell, Schmidt & Martin,* for defendant.

BOYLES, J. Plaintiffs sued the defendant in the circuit court for Kent county in an action of trespass on the case for damages, claiming that the defendant had defrauded plaintiffs in a transaction for the sale and purchase of a house. The gist of plaintiffs' claim is that the defendant fraudulently concealed the fact that the house was infested with termites, and misrepresented the facts in that regard. The case was tried by the court without a jury, resulting in a judgment of no cause for action, from which the plaintiffs appeal.

Defendant first listed her home for sale in July, 1946. The house had been closed for the summer and when the defendant returned in September, 1946, she discovered that considerable damage had been caused by rats. She immediately called one J. G. Vinkemulder, having learned that he was engaged in the "extermination business." The testimony shows that at that time, on September 6, 1946, Vinkemulder discovered that the house was infested with termites and so informed the defendant.

Later, in January of 1947, defendant listed her house for sale with one John B. McMullen, a real estate agent in Grand Rapids, who acted as the defendant's agent throughout these dealings between plaintiffs and the defendant. After some intervening time due to price negotiations, the house was finally exchanged by the defendant with the plaintiffs for a place they owned in Grand Rapids and $10,000 cash. The deal was finally consummated in November, 1947. About 6 months later the plaintiffs discovered the presence of termites in the house. Termites "swarmed in the sunroom, coming out of the hole where the crank goes into the window. * * *

There were literally thousands of termites on the floor and all over the sunroom." The instant suit for damages followed in due course of time.

Plaintiffs claim that the defendant knew that the house was infested with and had been damaged by termites, that she failed to disclose this fact to plaintiffs, and falsely represented to plaintiffs that the house was not and had not been infested with or damaged by termites. The defendant claims that she neither knew of the termites nor made any representation concerning them. In that connection the defendant is responsible for any representations made by McMullen, the real estate agent who acted as her agent in making the deal. *Chanler* v. *Venetian Properties Corp.*, 254 Mich 468.

In view of the dispute between the parties as to whether the defendant had knowledge of the presence of termites, and whether any misrepresentation as to the presence of termites in the house had been made to the plaintiffs by the defendant or her agent, it is necessary to refer to the testimony and evaluate the same.

One Vern Eicholtz, who was working for Vinkemulder, the termite exterminator, went to the house on September 6, 1946, at the defendant's call, and inspected it for rats, in the presence of the defendant. He found substantial evidence of a rat condition and advised the defendant how to go about exterminating the rats. In regard to evidence of the presence of termites, he testified as follows:

"At that time I found the termite condition there and informed Mr. Vinkemulder, whom I was working with. * * *

"I found evidence of termites more or less around the water meter at the bottom of the stairway as you come down and more or less in a little closet that was underneath the stairway in which part of the floor was gone. I don't believe I pointed those things

out to her. I went back, as I was working for Mr. Vinkemulder, and told him and we went back together. That was subsequent to my first visit. I got Mr. Vinkemulder to come back with me because he and I worked on termites together for 4 years. I believe something was said between me and Mrs. Ulrich about my bringing Mr. Vinkemulder because I called her attention to the floor condition.

"I came back with Mr. Vinkemulder about 2 days after my first visit and Mrs. Ulrich was there at the time we came back. Mr. Vinkemulder and I went through and pointed out the spots and showed the evidence of termites. Mrs. Ulrich was with us while we were doing this. We indicated to her that there were termites in this recreation room where the condition was the worst. This was the same place where I pointed them out before.

"According to my best recollection Mr. Vinkemulder told Mrs. Ulrich there were termites. At the time he told her he indicated portions of the house. I don't recall what, if anything, she said after he told her there were termites.

"At the time Mr. Vinkemulder and I were there Mr. Vinkemulder removed some wood from a portion of the basement. That occurred in my presence and in Mrs. Ulrich's presence. The wood showed termite condition. It showed where termites had worked. They work by destroying the wood, but they do not destroy the outside surface of the wood. * * *

"Q. And do you know positively that in the course of the conversation with the lady, whoever it might have been, you said in so many words, 'You have termites in the house'?

"A. Yes, I know that was said. * * *

"Q. If you examined the house in September of 1946 and termites were discovered in the house in June, 1948, isn't it conceivably possible that those termites got in at any interval in that 2-year period or 22-months period?

"*A.* They were there at the first time we looked it over."

Mr. Vinkemulder, the termite exterminator, testified as follows:

"I am in the termite control business and have been for approximately 15 years. * * * I have inspected the property at 859 Chippewa, S.E., on more than one occasion. The first occasion was September 6, 1946 when I was called in by Mr. Eicholtz. I went to the property with him. I went there because termites were suspected in the property and he told me that is why he wanted me to come there. After we got there we inspected the basement as I usually do and it was a very short time before we located termite activity. By that I mean evidence of termites.

"I found evidence of termites around the water meter and near the stairway. Mrs. Ulrich was there at the time in the basement with me. I told her there was evidence of termites there in the floor and that something should be done about it. She didn't believe that there were termite activities there but I showed her in the floor where there were termites and asked her if she would like to have me give her a figure to take care of it. She said at that time she didn't want me to, but if she did she would call me later."

Dr. Sullivan, one of the plaintiffs, testified:

"I would say that the first time the subject of termites came up in any conversation between me and Mr. McMullen (defendant's agent) about 859 Chippewa was in August after we got back from our vacation. That was August of 1947. The first conversation took place in my office. * * *

"*Q.* What, if anything, was said then about termites? * * *

"*A.* I asked him at that time if there were termites on the property.

"*Q.* And what did he say?

"*A*. At that time he said as far as he knew he had never seen any evidence of them.

"At that time I asked him if he would go and ask the owner if she knew anything, whether there were termites and he said he would ask her. After that, probably in September or October I again discussed the matter with Mr. McMullen.

"*Q*. And what was said then?

"*A*. He told me—I asked him if she said whether there were termites or not termites and he simply made the statement *there never had been any visible signs of termites,* which I took to be an answer from her.

"Subsequently, I was at the property when both Mrs. Ulrich and Mr. McMullen were present. At that time Mr. McMullen took me through the house and we went down in the recreation room. Mrs. Ulrich was hanging something up or taking it off the clothesline. When I came into the basement down the stairs there was a repair in front of the water meter, and a repair on the false base that the drain comes through and another over by the wall. I asked what caused that damage and why it was replaced. I was told that that was damage from the water meter. Mr. McMullen made the statement. Mrs. Ulrich was there in the room at the time."

The defendant in her own behalf testified as follows:

"*Q*. Now tell us, did you and Mr. Vinkemulder have any conversation at that time relative to the existence of termites in the house?

"*A*. I can't recall what we did. We talked about rats and extermination and about termites I don't remember anything about Mr. Vinkemulder talking to me about it. * * *

"*Q*. Did Mr. Vinkemulder ask you if you had had your house termite-proofed or say anything about that?

"*A*. He mentioned, as I remember now, I am rather vague about it because I was interested only in

getting the rats taken care of, he mentioned something about termites—had I ever had a termite examination? I said 'No, I never had any.' * * *

"Q. Did you ever talk with John B. McMullen about the existence or known existence of termites in your house?

"A. I never talked to John B. McMullen about it. I never knew I had any. *, * *

"Q. Mrs. Ulrich, Mr. Vinkemulder asked you whether or not you wanted to have your house completely inspected to determine whether or not you had any termite damage. Is that correct?

"A. He mentioned something about termites, Mr. Smith, but exactly what I wouldn't be able to say. I asked him to come there for the rat damage but not for termites.

"Q. Is it possible for you to say what he did say to you about the termites?

"A. Not exactly except he just mentioned—

"Any conversation that Mr. Vinkemulder had with me on termites, I cannot recall it."

The testimony of Mr. McMullen, defendant's agent, in regard to representations made to the plaintiffs as to the presence of termites was as follows:

"Q. Now did you ever have any discussion with him (plaintiff Dr. Sullivan) at any time relative to the existence of termites in this house?

"A. I have heard his testimony and I can recall very definitely one time. That was in the basement. In the many conversations he may have asked me. He probably did. I don't recall them exactly, the exact times and dates. I remember the one very well and I am sure he possibly does. * * *

"Q. What did he ask you about termites on that occasion?

"A. He asked me about the wood, new wood in the floor. He asked me what that was.

"Q. What did you tell him?

"A. I told him I learned about it when I first went through the property. I heard the story of the rats.

"I told him that there was wood damage around the water meter discovered at the time and that it was replaced. I think I said dry rot.

"*Q.* What was the exact conversation you had with him relative to termites?

"*A.* Well, I can't recall the exact wording of any conversation except I am sure he probably asked me if there were termites and I answered there were none to my knowledge.

"*Q.* Did you ever at any time make a definite representation to him that there were no termites in the house?

"*A.* I never made that. I said '*Not to my knowledge.*' * * *

"I don't recall whether at any time after Dr. Sullivan mentioned termites I talked with Mrs. Ulrich about whether there were termites there or not. I just don't recall. Maybe I did or maybe I didn't. I can't remember if I asked her. * * *

"*Q.* Isn't it true that after one of these conversations about termites with Dr. Sullivan, he requested you to ask Mrs. Ulrich about termites?

"*A.* I don't recall that. * * *

"*Q.* In other words, you are not denying Dr. Sullivan's testimony that he did?

"*A.* No, because I can't remember. I won't swear that he didn't. I don't recall that he did.

"*Q.* In any event, if he did you did not go and ask her about it?

"*A.* Not that I can recall. * * *

"*Q.* Did you ask her?

"*A.* We were going through the house and I saw this wood. I said 'What happened?' And she told me then about the dry rot and so on and so forth and that is all I remember."

The repairs and the replacement of the floor, which plaintiffs were told was due to water damage or dry rot, were made at the same place in the house where Vinkemulder and Eicholtz had informed the defendant of the presence of and the damage by termites.

Thus we have the positive testimony of 2 disinterested witnesses that the defendant had been informed that the house was infested with termites and shown the damage. On behalf of the defendant we have her testimony to the effect that if any such knowledge was conveyed to her, as testified to by plaintiffs' witnesses, she does not remember it. We are impelled to the conclusion that the testimony as to her knowledge of the presence of termites and the damage to her house by them clearly preponderates in favor of the plaintiffs.

The defendant further claims that neither she nor her agent expressly told the plaintiffs, or either of them, that the house was not infested with or damaged by termites. The literal truth of this claim may be conceded. However, the entire transaction, the inquiries made by plaintiff (Dr. Sullivan) as to termites, his attempt to obtain the facts from the defendant or her agents and the evasiveness of the defendant and her agent in giving a direct answer as to the presence of termites, plainly shows the impression intended to be conveyed to Dr. Sullivan, namely, that there were no termites or termite damage in the house.

"No one can evade the force of the impression which he knows another received from his words and conduct, and which he meant him to receive, by resorting to the literal meaning of his language alone. Everyone is responsible for the belief he intentionally creates, whether by words or otherwise, and will be precluded from profiting by any unconscionable use of an obligation which has been thus wrongfully obtained." *Mizner* v. *Kussell* (syllabus), 29 Mich 229.

"Designed partial statements which deceive, and concealment of facts such as to make those declared partial and misleading, are fraudulent in law." *Kenyon* v. *Woodruff* (syllabus), 33 Mich 310.

"The doctrine is settled in this State that if there was in *fact* a misrepresentation, though made innocently, and its deceptive influence was effective, the consequences to the plaintiff being as serious as though it had proceeded from a vicious purpose, he would have a right of action for the damages caused thereby; citing *Holcomb* v. *Noble,* 69 Mich 396 (headnote 3)." *Busch* v. *Wilcox* (syllabus), 82 Mich 315.

"Fraud may be consummated by suppression of a material fact by either party to a contract of sale which he is in good faith bound to disclose, as well as by open false assertions since by such suppression there is fraudulently produced a false impression upon the mind of the other party." *Wolfe* v. *A. E. Kusterer & Co.* (syllabus), 269 Mich 424.

"A representation, within the meaning of the law of fraud, is anything short of a warranty, which proceeds from the action or conduct of the party charged, and which is sufficient to create upon the mind a distinct impression of fact conducive to action." *Groening* v. *Opsata* (syllabus), 323 Mich 73.

"The excerpt from the charge, of which defendants complain, should be read in conjunction with the paragraph immediately preceding, which is as follows:

" 'Now, representations may be made orally, as plaintiffs claim in this suit, by writing, or by acts and conduct and arts and artifices calculated to deceive. While false representations generally consist of verbal or written statements, a misrepresentation in words is not essential. Stated in another way, a misrepresentation need not be express, but may be inferred from circumstances which are in fact equivalent to positive representation.'

"Plaintiffs do not claim that a fiduciary relationship existed between themselves and defendants. However, the latter were advised that plaintiffs were relying on the superior knowledge, experience as a builder, and information of Mr. Opsata. Conceivably the defendants might have taken the position,

when the questions were asked them by plaintiffs, that they did not care to make any statements whatsoever concerning the property. However they did not follow such course. On the contrary, they made replies to plaintiffs' specific inquiries, which replies did not bring forth the facts that plaintiffs were seeking to learn, but were in such form as naturally tended to reassure plaintiffs and to cause them to proceed on the assumption that the property was not in any danger from erosion. Under such circumstances the concealment of the true facts and the deliberate creating of false impressions and inferences is the equivalent of an express and intentional misrepresentation." *Groening* v. *Opsata, supra,* 82.

Defendant relies on *Urban* v. *Doolan,* 282 Mich 271. In that case the purchasers sought to rescind a contract for the purchase of a farm on which the house was infested with termites, on the ground of misrepresentation and fraud. The plaintiffs' only proof of misrepresentation or fraud was that one of the vendors had said that the house was a very good house, a nice house, in good condition. The Court held that said vendor had merely given expression to an opinion which, although it later proved to be a poor one, did not amount to misrepresentation or fraud. The case is plainly distinguishable from the instant case on the facts.

It may be conceded that the defendant testified truthfully as to her lack of recollection of having been informed of the presence of termites; likewise, it may be conceded that her agent testified truthfully in saying that there were no termites *within his knowledge,* that he did not see any. However, the result has been to convey to plaintiffs a negative answer to their inquiry about termites, and plainly such result was intended. The case is controlled by the above decisions. We find that the evidence of

misrepresentation and fraud clearly preponderates in favor of the plaintiffs.

The only remaining question involves the assessment of damages. This Court may remand for that purpose alone. Court Rule No 72, § 1 (g), (1945); *Rich* v. *Daily Creamery Co.*, 303 Mich 344.

Reversed and remanded for assessment of plaintiffs' damages and entry of judgment for plaintiffs in accordance therewith, with costs of both courts.

SHARPE, C. J., and BUSHNELL, NORTH, DETHMERS, BUTZEL, and CARR, JJ., concurred with BOYLES, J.

REID, J. (*dissenting*). I do not concur in the opinion written by my Brother Mr. Justice BOYLES.

While it is true Mr. Vinkemulder and Mr. Eicholtz testified that Mrs. Ulrich the defendant was told September 6, 1946, that her house was infested with termites, yet such statements were denied by defendant and her daughter, Mrs. Davidson. It is very clearly apparent defendant did not understand that the house was so infested, which conclusion is at least somewhat supported by the fact that she did nothing whatever to exterminate the termites. Defendant testified:

"If I had known of any termites in the house I would have had it fixed."

Termites were not actually discovered until May, 1948, nearly 2 years later, and after the sale to plaintiffs and after plaintiffs had moved into the premises. If Mrs. Ulrich is correct in her testimony, she was not told there were termites, September 6, 1946. In any event, there were no termites discovered by her or her family for 14 months thereafter while she (defendant) was still inhabiting the house with her daughter and son-in-law, none of whom discovered infestation by termites while there during the 14

months. The plaintiffs themselves, who seemed to have entered into possession some time in November, 1947, did not discover there were termites in the property until May of 1948.

Plaintiffs do not claim defendant directly represented to them there were no termites. Defendant's agent McMullen told plaintiffs that termites had.not been seen by him. There is no testimony that Mrs. Ulrich told her agent McMullen to tell plaintiffs there were no termites in the house. McMullen testified that defendant Mrs. Ulrich did not tell him that there were no termites nor direct him to say to plaintiffs there were no termites in the house.

The Massachusetts court cites the rule of nonliability for bare nondisclosure with many authorities in support thereof in *Swinton* v. *Whitinsville Savings Bank,* 311 Mass 677 (42 NE2d 808, 809, 141 ALR 965).

Mrs. Ulrich, the defendant, evidently believed there were in fact no termites present and her failure to tell plaintiffs there were termites in the house (if such was the case) is no breach of her warranty in the deed nor of her duty while she was acting in pursuance of her honest belief. In making the sale to plaintiffs, defendant made no misrepresentation. The parties were dealing at arms' length and the doctrine of *caveat emptor* is applicable. Plaintiffs were not prevented from inspecting the premises for themselves. The conclusion of the trial court is not against the clear preponderance of the evidence.

The judgment for defendant should be affirmed. Costs to defendant.