RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0198p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

JOHN T. MACDONALD, JR., CHELSEA A. PEJIC, SHAWN HAFF, STEVEN BARON, DIMPLE KUMAR, CARRIE KALBFLEISCH, ANDERS CHRISTENSEN, DANNY WAKEFIELD, DAN GUINN, BENJAMIN FORSGREN, SHANE HOBBS, and KEVIN PRINCE, on behalf of themselves and all others similarly situated,
      *Plaintiffs-Appellants/Cross-Appellees*,

            *v.*

THOMAS M. COOLEY LAW SCHOOL,
      *Defendant-Appellee/Cross-Appellant*.

Nos. 12-2066/2130

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:11-cv-00831—Gordon J. Quist, District Judge.

Argued: June 12, 2013

Decided and Filed:  July 30, 2013

Before:  MARTIN and COOK, Circuit Judges; GRAHAM, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Jesse Strauss, STRAUSS LAW PLLC, New York, New York, for Appellant/Cross-Appellee. Michael P. Coakley, MILLER CANFIELD, PADDOCK AND STONE, P.L.C., Detroit, Michigan, for Appellee/Cross-Appellant **ON BRIEF:** Jesse Strauss, STRAUSS LAW PLLC, New York, New York, for Appellant/Cross-Appellee. Michael P. Coakley, Brad H. Sysol, Paul D. Hudson, MILLER CANFIELD, PADDOCK AND STONE, P.L.C., Detroit, Michigan, for Appellee/Cross-Appellant.

_____

[*]The Honorable James L. Graham, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

———————————

**OPINION**

———————————

BOYCE F. MARTIN, JR., Circuit Judge. The plaintiffs, twelve graduates of the Thomas M. Cooley Law School, sued their alma mater in district court, alleging that the school disseminated false employment statistics which misled them into deciding to attend Cooley. The graduates relied on these statistics as assurances that they would obtain full-time attorney jobs after graduating. But the statistics portrayed their post-graduation employment prospects as far more sanguine than they turned out to be. After graduation, the Cooley graduates did not secure the kind of employment the statistics advertised—or in some cases any employment at all. They claimed that, had they known their true—dismal—employment prospects, they would not have attended Cooley—or would have paid less tuition. Because their Cooley degrees turned out not to be worth what Cooley advertised them to be, they have sought, among other relief, partial reimbursement of tuition, which they have estimated for the class would be $300,000,000. But because the Michigan Consumer Protection Act does not apply to this case's facts, because the graduates' complaint shows that one of the statistics on which they relied was objectively true, and because their reliance on the statistics was unreasonable, we **AFFIRM** the district court's judgment dismissing their complaint for failure to state any claim upon which it could grant relief.

From the prolix amended complaint (sixty-six pages with one-hundred and twenty-six paragraphs) we take the following facts, which we must regard as true. *City of Columbus, Ohio v. Hotels.com, L.P.*, 693 F.3d 642, 648 (6th Cir. 2012) (citing *Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625, 629 (6th Cir. 2009)). We also derive the facts from the exhibits attached to the complaint, because the complaint refers to them and they are "central to the claims" in it. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)).

The Thomas M. Cooley Law School, a non-profit corporation accredited by the American Bar Association, has its main campus in Lansing, Michigan, with satellite campuses in the Michigan cities of Ann Arbor, Auburn Hills, and Grand Rapids. Cooley enrolls more law students than any other law school in the country: for the 2010–2011 academic year, the school enrolled approximately 4,000 students, eighty-two percent of whom attended part-time. On August 8, 2011, Cooley announced plans to open a satellite campus, in Riverview, Florida, near Tampa Bay, to accommodate another 700 law students.

Cooley charges full-time students tuition of $36,750 per year. With room, board, and living expenses, the total cost to attend Cooley Law is estimated to be $52,000 per year. For the fiscal year 2009, Cooley's total operating revenue was $117,577,686, which included $108,979,296 in tuition. Its total operating costs were $97,196,760, including $47,158,197 that Cooley paid its employees. Cooley paid its Dean, Don LeDuc, $548,047 in total compensation during fiscal year 2008, and it paid him $523,213 during fiscal year 2009, making LeDuc one of the highest paid law-school deans in the country. Cooley has also continued to pay its former Dean and founder, Thomas Brennan, $368,581 in 2008, and $370,245 in 2009. Cooley pays its other eleven highest-paid employees amounts ranging from between $200,225 to $249,999.

According to the amended complaint, *U.S. News & World Report* reported that Cooley has the lowest admissions standards of any accredited or provisionally accredited laws school in the country. In 2010, the school accepted eighty-three percent of all applicants, an acceptance rate nearly fifteen percentage points greater than the second least-selective law school, Phoenix School of Law. In 2010, the mean Law School Admissions Test score for incoming students at Cooley was 146, and the mean undergraduate grade-point average was 2.99—both lows for all accredited and provisionally accredited law schools. Cooley also has low retention rates. For example, in 2008, almost thirty-two percent of the roughly 1,500 students who enrolled at Cooley failed to enter their second year, and ten percent of second-year students failed to continue into their third year. Some third-year students do not complete their degrees.

In 2008, twenty-two third-year students, about three percent of the class, either failed or dropped out during the academic year.

The twelve plaintiffs in this case fared better, having graduated from Cooley between 2006–2010.  Each individual did so, however, burdened with an average of $105,798 in student-loan debt, according to *U.S. News & World Report*.

The graduates averred that they decided to enroll at Cooley, or to continue to study there, "to prospectively better themselves and their personal circumstances through the attainment of full-time employment in the legal sector."  In making their decisions, the graduates relied on the "Thomas M. Cooley Law School Employment Report and Salary Survey" that Cooley provided on its website and to prospective and current students.  The plaintiffs attached to the complaint, as exhibits numbered two through six, an Employment Report and Salary Survey for each of the graduating classes in 2004, 2005, 2006, 2009, and 2010.

Each Employment Report and Salary Survey purported to show the employment outcomes of Cooley graduates in a given class year by showing: the percentage of graduates employed, the average starting salary of graduates, and the percentages of graduates employed in various sectors—private practice, government, public interest, academic, judicial clerkship, and business—and the average starting salary in each sector.  Cooley produced these statistics by sending out surveys to graduates in a given class, some of whom would complete the surveys and return them.  For example, the responses of about eighty-three percent of the 2010 graduates provided the basis for the 2010 Employment Report and Salary Survey.  Cooley has never audited nor verified the responses.

Cooley, according to the graduates, makes "two uniform, written misrepresentations" in each Employment Report and Salary Survey.  The first supposed misrepresentation in each Employment Report is the "percentage of graduates employed" statistic.  For example, the 2010 Employment Report states, next to the phrase "percentage of graduates employed" that seventy-six percent of its graduates were employed (within nine months of graduation).  According to the 2010 Employment

Report, fifty percent were employed in "private practice," fifteen percent in "government," two percent in "public interest," three percent in "academic," three percent in "judicial clerkship," and eighteen percent in "business."

The second alleged misrepresentation in each Employment Report is the "average starting salary of all graduates" statistic. For example, in the 2010 Employment Report, Cooley stated that the "average starting salary for all graduates" was "$54,796."

The plaintiffs relied on these two supposed misrepresentations—the "percentage of graduates employed" and the "average starting salary of all graduates"—in deciding either to apply to Cooley or to remain enrolled there. These statistics, however, did not correspond with their actual employment prospects upon graduation.

Most of the plaintiffs had difficulty finding full-time, paying jobs as lawyers after graduating. Anders Christensen graduated from Cooley Law in 2010, passed the Utah Bar, and worked as a law clerk for a Utah law firm, where he is currently an associate. Carrie Kalbfleisch, who graduated in 2010, passed the Kentucky Bar and started her own law firm in Kentucky. After graduating in 2010, John T. MacDonald, Jr. passed the Michigan Bar, but could not find full-time, permanent legal employment and so was forced to open up his own law firm which he still operates. Shawn Haff, who also graduated in 2010, could not find full-time, permanent legal employment, and so he took temporary, contract assignments reviewing documents to make ends meet. He now owns and operates his own law firm in Michigan, where he is licensed to practice law. Dimple Kumar, who graduated in 2009, passed the New York Bar, but tried unsuccessfully for over nine months to find full-time, permanent legal employment. He was forced to take temporary, contract assignments reviewing documents to make ends meet, until he found full-time employment practicing landlord-tenant law. He currently owns and operates his own law firm. Dan Guinn, who also graduated in 2009, passed the Ohio Bar, but was also forced to take temporary, contract assignments reviewing documents to make ends meet. He now owns and operates his own law firm. Similarly, Kevin Prince, after graduating in 2009, passed the Michigan Bar, but was forced to take temporary, contract

assignments reviewing documents to make ends meet, until finding full-time, permanent employment, nearly a year after graduating from law school. Benjamin Forsgren, who graduated in 2008, passed the Utah Bar and began his current position as a contracts manager at a Utah company. Lastly, Chelsea A. Pejic, who graduated in 2006, could not find gainful legal employment despite circulating hundreds of resumes, and so was forced to endure a long period of unemployment. She passed the Illinois Bar, and operated her own law firm for a brief period while working as a volunteer staff attorney and a temporary contract attorney.

Others have not been able to find any legal employment. Shane Hobbs, who lives in Pennsylvania, graduated in 2010. He failed to secure any type of legal employment and has worked as a substitute teacher and day laborer at a golf course. Steven Baron, who graduated in 2008, lives in Los Angeles, California. He is currently unemployed and has failed to get any kind of job, despite circulating hundreds of resumes. Danny Wakefield graduated from Cooley Law in 2007. Although he passed the Utah Bar, and used to be a member in good standing, he voluntarily assumed inactive status because he could not get any type of employment in the legal profession. He currently manages the deliveries of telephone books.

These individuals are not alone. As the amended complaint states, the plaintiffs, like all other law students throughout the country, graduated into one of the "grimmest legal job markets in decades." According to the amended complaint, a recent study found that there were twice as many people who passed a bar examination—53,508—as there were job openings—26,239. *See* Catherine Rampell, *The Lawyer Surplus, State by State*, New York Times (June 27, 2011), *http*://economix.blogs.nytimes.com/2011/06/27/the-lawyer-surplus-state-by-state/.

The graduates sued Cooley in a three-count complaint alleging that it had: (1) violated Michigan's Consumer Protection Act, M.C.L.A. §§ 445.901–445.922; (2) committed common-law fraud under Michigan state law; and (3) committed negligent misrepresentation, also under Michigan state law. Cooley moved to dismiss the amended complaint, and the district court, in a published opinion and order, granted

Cooley's motion. *MacDonald v. Thomas M. Cooley Law Sch.*, 880 F. Supp. 2d 785, 788 (W.D. Mich. 2012). As to count one, the district court concluded that the Act "d[id] not apply to the purchase of a legal education to attain employment." *Id.* As to counts two and three, the district court concluded that the graduates failed to state a claim upon which relief could be granted because one representation—the statistic about "percentage of graduates employed"—was "literally true," *id.,* and the graduates "unreasonably relied," *id.*, on the other statistic about "average starting salary for all graduates." The graduates timely appealed, and Cooley cross-appealed.

We review *de novo* the grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Republic Bank & Trust Co. v. Bear Stearns & Co., Inc.*, 683 F.3d 239, 246 (6th Cir. 2012) (citing *La. Sch. Emps. Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 477 (6th Cir. 2010)). Our review of the district court's dismissal must construe the record in the light most favorable to the non-moving party, here the graduates, and we must accept as true all of the complaint's well-pleaded allegations. *Id.* (citing *Robert N. Clemens Trust v. Morgan Stanley DW, Inc.*, 485 F.3d 840, 845 (6th Cir. 2007). We must ascertain whether the complaint contains "'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face[.]'" *Bartholomew v. Blevins*, 679 F.3d 497, 499–500 (6th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

On appeal, the graduates argue that the district court erred in two ways: (1) it "impermissibly created an exception to coverage" under the Michigan Consumer Protection Act "for any purchase whose object is to make money or find or maintain employment" and (2) it erroneously held, as a matter of law and without discovery, that the graduates could not have reasonably relied upon Cooley's statistics in its Employment Reports and Salary Surveys. We address each argument in turn.

The district court held that the Michigan Consumer Protection Act "d[id] not apply to the purchase of a legal education to attain employment[.]" *MacDonald*, 880 F. Supp. 2d at 788. The district court reasoned that, because the graduates attended law school—as they themselves declared in the amended complaint—"to prospectively better

themselves and their personal circumstances through the attainment of full-time employment in the legal sector," they attended for a "business purpose." *Id.* at 792. But the Act does not cover purchases that consumers make for business or commercial purposes. *Id.* Therefore, the district court held that the Act, as a matter of law, does not cover the graduates' purchasing of a legal education, and so they cannot state a claim under it. We agree.

The Michigan Consumer Protection Act, sections 445.901–445.922, covers a wide variety of conduct: "the advertising, solicitation, offering for sale or rent, sale, lease, or distribution of a service or property, tangible or intangible, real, personal, or mixed, or any other article, or a business opportunity." Mich. Comp. Laws. Ann. § 445.902(g). The Act prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce[.]" *Id.* § 445.903(1). The Act defines "trade or commerce" as "the conduct of a business providing goods, property, or service *primarily for personal, family, or household purposes*[.]" *Id.* § 445.902(g) (emphasis added). This definition, then, creates an exception to the Act's coverage: if a consumer—whether a business or a natural person—buys a good, property, or service for a business purpose—that is, not "primarily for [a] personal, family, or household purpose[ ]"—then the Act does not apply.

The Michigan Supreme Court has held that the Act, while applying to consumer purchases, "does not apply to purchases that are primarily for business purposes." *Slobin v. Henry Ford Health Care*, 666 N.W.2d 632, 634 (Mich. 2003) (per curiam). In *Slobin*, a law firm requested medical records on behalf of a client from a copy service. *Id.* at 633. The law firm claimed that the service charged too much for the copies and claimed that it violated the Act by charging "a consumer price grossly in excess of similar copying rates." *Id.* The Michigan Supreme Court held that the claim failed "as a matter of law because obtaining medical records for the purpose of litigation is not 'primarily for personal, family, or household use,' as required by the [A]ct." *Id.* at 635.

*Slobin* cited approvingly two Michigan Court of Appeals cases which "reflect[ed] a correct understanding of the scope and purpose of the [Act]" because they excluded

from the Act purchases of goods or services for business purposes. *Id.* at 635. In the first case, the plaintiff bought a truck from the defendant and sought to hold the defendant liable under the Act. Because the plaintiff testified that he attributed eighty percent of the miles he drove the truck to business purposes, with the rest attributable to personal use, the court summarily disposed of the plaintiff's claim under the Act, holding that "'if an item is purchased primarily for business or commercial rather than personal purposes, the [Act] does not supply protection.'" *Id.* (quoting *Zine v. Chrysler Corp.*, 600 N.W.2d 384, 393 (Mich. Ct. App. 1999)). In the second case, the plaintiffs sought to hold the defendant, which provided electricity to the plaintiffs' hog-production facility, liable for damages to its hogs allegedly caused by "'stray voltage;'" but the court held that the Act did not apply because the plaintiffs bought electricity from the defendant "'primarily for the purpose of operating their business rather than 'primarily for personal, family or household purposes.'" *Id.* (quoting *Jackson Cnty. Hog Producers v. Consumers Power Co.*, 592 N.W.2d 112 (Mich. Ct. App. 1999) (per curiam)).

Here, the graduates bought their legal education—like the medical records in *Slobin*, the pickup truck in *Zine*, or the electricity in *Jackson County*—for a business purpose. We must accept the facts in their complaint as true. The complaint averred that each of the graduates intended to use his or her law degree "to prospectively better themselves and their personal circumstances *through the attainment of full-time employment in the legal sector*." (emphasis added). The graduates, then, did not attend law school for personal purposes, nor for dilettantish reasons. As the district court wryly commented, they "did not purchase a Cooley legal education so that they could leisurely read and understand Supreme Court Reports[.]" *MacDonald*, 880 F. Supp. 2d at 792. We agree with the district court's reasoning, and we hold that, based on the amended complaint's facts, the Act did not cover their purchasing of a legal education.

If, for example, the graduates had alleged that they attended Cooley to get a legal education with no intention of using it to make money, then the district court might have erred in holding that the Act did not apply. But because the graduates admitted in their

complaint that they bought their legal education for a business purpose, to make a living, the district court correctly concluded that that they failed to state a claim under the Act.

Therefore, we need not reach Cooley's alternative argument in its cross-appeal that the Act did not apply because of the Act's exemption for any "'transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States.'"  *Liss v. Lewiston-Richards, Inc.*, 732 N.W.2d 514, 515 (Mich. 2007) (citing Mich. Comp. Laws Ann. § 445.904(1)(a)).

Instead, we address the graduates' contention that the district court erred in dismissing their second claim, that Cooley committed fraudulent misrepresentation by making, in its Employment Report and Salary Survey for any given year, "two uniform, written misrepresentations."   These were: (1) the statistic showing "percentage of graduates employed," and (2) "average starting salary for all graduates."

We first address the graduates' claim that Cooley committed fraudulent misrepresentation by disseminating, in its Employment Reports, the "percentage of graduates employed" statistic.  For example, the 2010 Employment Report states, next to the phrase "percentage of graduates employed" that seventy-six percent of its graduates were employed (within nine months of graduation).  According to the 2010 Employment Report, of the 2010 graduates, fifty percent were employed in "private practice," fifteen percent in "government," two percent in "public interest," three percent in "academic," three percent in "judicial clerkship," and eighteen percent in "business."

The graduates claimed that, to a reasonable consumer, this statistic meant that the jobs reported were full-time, permanent positions for which a law degree was required or preferred.  But, the graduates argued, this percentage was false because it included any type of employment, including jobs that had absolutely nothing to do with the legal industry, and which did not require a law degree or which were temporary or part-time. In their words, a graduate "could be working as a barista in Starbucks . . . and would be deemed employed and working in 'business,' even though such employment [wa]s

clearly temporary in nature and obviously d[id] not require a JD degree." The district court concluded that the graduates failed to state a claim for fraud under Michigan law for two reasons. First, because the "percentage of graduates employed" statistic was "literally true[,]" *MacDonald*, 880 F. Supp. 2d at 788, and was "not objectively false." *Id.* at 794. Second, the district court held that the graduates' reliance on the "percentage of graduates employed" statistic as including "only graduates who were employed in full-time legal positions" was unreasonable. *Id.* Again, we agree with the district court.

Under Michigan law, to prove that a defendant committed fraudulent misrepresentation, a plaintiff must prove six elements: (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, it knew that it was false, or made the representation recklessly, without any knowledge of its truth, and as a positive assertion; (4) the defendant made the representation with the intention that it should be acted on by the plaintiff; (5) the plaintiff acted in reliance on the representation; and (6) the plaintiff suffered injury due to his reliance on the representation. *Hord v. Envtl. Research Inst. of Mich.*, 617 N.W.2d 543, 546 (Mich. 2000) (per curiam) (citing *Hord v. Envtl. Research Inst. of Mich.*, 579 N.W.2d 133, 135 (Mich. Ct. App. 1998)).

An additional requirement for element five is that the plaintiffs' reliance on the alleged misrepresentation must have been reasonable. *Novak v. Nationwide Mut. Ins. Co.*, 599 N.W.2d 546, 553–54 (Mich. Ct. App. 1999); *Nieves v. Bell Indus., Inc.*, 517 N.W.2d 235, 238 (Mich. Ct. App. 1994). Although we have found no case in which the Michigan Supreme Court has held that the reliance must be reasonable, intermediate appellate court cases, including *Novak,* have held that the plaintiffs' reliance must be reasonable. *Novak* held "that the reliance must indeed be reasonable." *Novak*, 599 N.W.2d at 533 (citing *Nieves*, 517 N.W.2d at 238; *Webb v. First of Mich. Corp.*, 491 N.W.2d 851 (Mich. Ct. App. 1992)). *Novak* explained that *Nieves* and *Webb* "stated the correct rule of law, because a person who *unreasonably* relies on false statements should not be entitled to damages for misrepresentation." *Id*. at 554. We follow *Novak* and the cases it cited, because "ordinarily a state's intermediate appellate court decisions

are the best authority in the absence of any supreme court precedent[.]" *United States v. Simpson*, 520 F.3d 531, 536 (6th Cir. 2008).

Here, as to the "percentage of graduates employed" statistic, the graduates' amended complaint showed that they could not establish the second element: that the representation was false. Their failure is analogous to the plaintiff's failure in *Hord v. Environmental Research Institute of Michigan*, 617 N.W.2d 543 (Mich. 2000) (per curiam). In *Hord*, a representative of the defendant, a corporation, interviewed the plaintiff for a job and provided him with information about the company, including an operating summary containing financial data. *Id.* at 545. The plaintiff accepted the job, but the defendant, for economic reasons, ultimately gave him a lay-off notice a year after he began working for the defendant. *Id.* The plaintiff sued, alleging that the defendant had misled him about its financial soundness. *Id.* The trial court submitted the case to a jury on both a standard fraud claim involving fraudulent misrepresentation and a silent fraud theory. *Id.* The jury returned a verdict for the plaintiff, which the Michigan Court of Appeals affirmed. *Id.*

The Michigan Supreme Court reversed. *Id.* The court held that the plaintiff failed to establish element (2), that the financial statement "was in any way false or misleading." *Id.* at 549. The Court acknowledged that the plaintiff interpreted the operating summary "as a representation of the financial status of the organization." *Id.* But, the court said, "that simply is not a reasonable interpretation of information that, on its face, presented data for a period that ended well before the plaintiff's job interview." *Id.* The court reiterated that fraudulent misrepresentation "requires a *false representation* by the defendant." *Id.* And "[a] plaintiff's subjective misunderstanding of information that is not objectively false or misleading cannot mean that a defendant has committed the tort of fraudulent misrepresentation." *Id.*

The graduates cannot prove that Cooley committed fraudulent misrepresentation based on the "percentage of graduates employed" because the graduates cannot prove that this statistic was false. The statistic does not say percentage of graduates "employed in full-time, permanent positions for which a law degree is required or preferred." It

only says percentage of graduates "employed." The graduates might have thought that "employed" meant employed in a permanent position for which a law degree was required or preferred—but, again "[a] plaintiff's subjective misunderstanding of information that is not objectively false or misleading cannot mean that a defendant has committed the tort of fraudulent misrepresentation." *Id.*

The graduates argue that the district court "erred when it made determinations of fact on a motion under Rule 12(b) with respect to whether the [p]laintiffs could have reasonably relied on Cooley's advertised employment rates and salary information." But, under Michigan law, a court may determine, based on the complaint, that a plaintiff's reliance was unreasonable, as illustrated by *Novak*, 599 N.W.2d at 549.

In *Novak*, the defendant, an insurance company, fired the plaintiff, one of its insurance sales agents. *Id.* When the plaintiff sued, one of the claims he brought was for fraudulent misrepresentation, *id.* at 552, based on the following facts. When the plaintiff had signed the defendant's employment agreement, it included the following: (1) that he was forbidden from selling insurance for another company other than the defendants (unless the defendants specifically directed him to do so) and (2) that his employment was terminable at will by either party. *Id.* at 549. But the defendants induced him into signing the employment agreement by telling him two statements that directly contradicted the written document: (1) the at-will provision in the employment agreement did not apply to him, and (2) he would be allowed to sell insurance for companies other than the defendant. *Id.* at 552–53. The trial court summarily disposed of the case, and the Michigan Court of Appeals affirmed. *Id.* at 549.

The court of appeals observed that "the written contract, with its integration clause, expressly contradicted" the two statements the defendants made, which rendered the "plaintiff's alleged reliance on these statements unreasonable." *Id.* at 553. So, the court then determined—as a matter of law—that the plaintiff's reliance on the statements "was not reasonable in light of the written contract," and, therefore, "did not support a misrepresentation claim." *Id.* at 554 (citing *Nieves*, 517 N.W.2d at 235). *Novak*,

establishes that a court may determine, at the pleading stage and without discovery, whether the plaintiff's reliance was unreasonable.

Here, the graduates' reliance on the "percentage of graduates employed" statistic to mean "percentage of graduates employed in full-time legal positions" was not reasonable because, as the district court noted, "basic deductive reasoning informs a reasonable person that the employment statistic includes all employed graduates, not just those who obtained or started full-time legal positions." *MacDonald*, 880 F. Supp. 2d at 794 (citation omitted). We therefore conclude that the graduates failed to state a claim of fraudulent misrepresentation under Michigan Law based on the "percentage of graduates employed" statistic.

Nor can the graduates establish a claim for fraudulent misrepresentation based on the statistic for "average starting salary for all graduates" because their reliance on it was unreasonable. The graduates alleged that Cooley committed fraudulent misrepresentation by including the line in each year's Employment Report and Salary Survey stating the "average starting salary for all graduates."

For example, the Employment Report for 2010 states that the "average starting salary for all graduates" was $54,796. On its face, the phrase "all graduates" means just that: all Cooley graduates—not just the ones who responded to the survey—made, on average, $54,796. One could assume that, because there were 934 graduates, the average starting salary for all 934 graduates was $54,796. The title of the document containing this statement is "Employment Report and Salary Survey." Therefore, it cannot be that the average starting salary of all 2010 graduates was $54,796, because the document, entitled "Employment Report and *Salary Survey*" (emphasis added) was not based on the responses of all of the Cooley graduates in 2010; rather, the document states that the number of 2010 graduates was 934, but the number of graduates with employment status known was 780. So, the "[a]verage starting salary for all graduates" would instead mean the average starting salary of graduates who responded to the survey and chose to include their salary information—not the average salary of all Cooley graduates in any given year.

We agree with the district court that this statistic is "objectively untrue," *MacDonald*, 880 F. Supp. 2d at 794, but that the graduates' reliance upon it was "also unreasonable," *id.* at 796, which dooms their fraudulent misrepresentation claim.

Despite the statement's untruth, the graduates cannot demonstrate that their reliance on this statement was reasonable. Unreasonable reliance includes relying on an alleged misrepresentation that was expressly contradicted in a written contract that a plaintiff reviewed and signed. *Novak*, 599 N.W.2d at 553–54; *Nieves*, 517 N.W.2d at 237–38. A plaintiff unreasonably relies on one of the defendant's statements if another of the defendant's statements contradicts it.

Here, the statement "average starting salary for all graduates" expressly contradicted other statements in the very same report showing that the report itself was based not on data for the entire class, but on data from those who completed the surveys. The Cooley graduates' reliance on the statement that the "[a]verage starting salary for all graduates" was "$54,796" was unreasonable in light of both the statement that the "[n]umber of graduates with employment status known" was less than the total number of graduates and the very title of the report (a "Salary Survey"). Because their reliance was unreasonable, their claim for fraudulent misrepresentation failed as a matter of law. Therefore, the district court properly dismissed the claim.

Next, we address the graduates' claim that Cooley committed silent fraud, also called fraudulent concealment, which has "long been recognized in Michigan." *Roberts v. Saffell*, 760 N.W.2d 715, 719 (Mich. Ct. App. 2008) (citing *Lorenzo v. Noel*, 522 N.W.2d 724, 725 (Mich. Ct. App. 1994)). This cause of action prohibits "'[a] fraud arising from the suppression of the truth[,]'" which can harm a plaintiff as much as "'that which springs from the assertion of a falsehood[;]'" courts in Michigan, therefore, "'have not hesitated to sustain recoveries where the truth has been suppressed with the intent to defraud.'" *Noel*, 522 N.W.2d 724 at 725 (quoting *Williams v. Benson*, 141 N.W.2d 650, 654 (Mich. Ct. App. 1966)).

The graduates alleged that Cooley committed the tort of silent fraud by failing to disclose material facts accompanying its statistics. For example, as to the statistic on

"percentage of graduates employed," the graduates claim that Cooley committed silent fraud by failing to disclose what percentage of graduates were employed in either part-time or temporary positions, or whether the jobs required law degrees. As to the statistic of "average starting salary for all graduates," the graduates assert that Cooley committed silent fraud by failing to disclose that it calculated this statistic not based on all the graduates, but only based on a subset of graduates: those who submitted their salary information in response to the survey.

But to state a claim for the tort of silent fraud, a plaintiff must allege more than non-disclosure; a plaintiff must establish that the defendant had "a legal duty to make a disclosure." *Hord*, 617 N.W.2d 543, 550 (citing *U.S. Fid. & Guar. Co. v. Black*, 313 N.W.2d 77, 88 (Mich. 1981). Such a legal duty to make a disclosure arises "most commonly in a situation where inquiries are made by the plaintiff, to which the defendant makes incomplete replies that are truthful in themselves but omit material information." *Id.* (citing *Groening v. Opsata*, 34 N.W.2d 560, 564–566 (Mich. 1948); *Sullivan v. Ulrich*, 40 N.W.2d 126, 130–132 (Mich. 1949)). In *Groening*, a duty arose where the plaintiff-buyer asked the defendant-seller if the bluff on which the house that the plaintiff was about to buy was eroding. This inquiry triggered the defendant's duty to tell the plaintiff-buyer the truth—that the cliff was in fact eroding. *Id.* Similarly, in *Sullivan*, the plaintiff-buyer's having asked the defendant-seller if the house he was about to buy had termites created duty in the defendant-seller to tell plaintiff-buyer that the house did in fact have termites. *Id.*

But unlike the house buyers in *Groening* and *Sullivan*, the Cooley graduates did not allege in their amended complaint that they ever asked Cooley about the claims in its Employment Reports so as to create a duty for Cooley to disclose the truth. As the district court noted, the graduates admitted, in their response to Cooley's motion to dismiss, that they did "not allege that they specifically requested additional information regarding Cooley's employment reports beyond what was publicly available[.]" *MacDonald*, 880 F. Supp. 2d at 788. This failure to inquire dooms the silent-fraud

claim.  Absent such an inquiry, Cooley had no duty to make any further disclosure concerning its Employment Reports.

Next, we address the graduates' claim of negligent misrepresentation, a theory which we are not even sure the Michigan Supreme Court would recognize as applicable to these facts.  The Michigan Supreme Court has recognized the tort of negligent misrepresentation in only one context.  *Williams v. Polgar*, 215 N.W.2d 149, 156 (Mich. 1974), held that an abstracter could be liable under a theory of negligent misrepresentation where the abstracter negligently performed a title search.  But the Michigan Supreme Court stressed that it recognized the tort of negligent misrepresentation only in the title-search context.  The Court said "[t]hus, we adopt the tort action of negligent misrepresentation *in this context*."  *Id.*  (emphasis added).

The Michigan Court of Appeals, has, in published opinions, recognized the tort of negligent misrepresentation.  *Alfieri v. Bertorelli*, 813 N.W.2d 772, 775 (Mich. Ct. App. 2012) held that "'[a] claim for negligent misrepresentation requires plaintiff to prove that a party justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care.'" (quoting *Unibar Maint. Servs., Inc. v. Saigh*, 769 N.W.2d 911, 919 (Mich. Ct. App. 2009)).  The Michigan Court of Appeals first mentioned the tort of negligent misrepresentation in 1989, saying that "the tort involved in the underlying suit, negligent misrepresentation, was one requiring proof that a party justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Law Offices of Lawrence J. Stockler, P.C. v. Rose*, 436 N.W.2d 70, 79 (Mich. Ct. App. 1989) (citing *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 367 S.E.2d 609 (N.C. 1988)).  A later case addressed a claim of negligent misrepresentation by stating that negligent misrepresentation "requires plaintiff to prove 'that a party justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care.'" *The Mable Cleary Trust v. The Edward-Marlah Muzyl Trust*, 686 N.W.2d 770, 783 (Mich. Ct. App. 2004) (quoting *Law Offices of Lawrence*

*J. Stockler, PC*, 436 N.W.2d at 79), *overruled on other grounds by Titan Ins. Co. v. Hyten*, 817 N.W.2d 562 (Mich. 2012).

But we need not decide whether Michigan law recognizes negligent misrepresentation as a cause of action, because the Cooley graduates still have failed to fulfill the tort's requirement of justifiable, *Alfieri*, 813 N.W.2d at 775, or reasonable reliance, as our discussion above regarding their claim for fraudulent misrepresentation shows.

Lastly, we address Cooley's cross-appeal, which raises three arguments, two of which the district court rejected: that the district court should have dismissed the case because the Cooley graduates failed to join the American Bar Association (ABA) and the National Association for Law Placement (NALP) as Federal Rule of Civil Procedure 19 requires, and because the Cooley graduates' case is preempted by federal law requiring law schools to report employment data. We agree with the district court's reasoning. Cooley also argues in its cross-appeal (as it did before the district court) that federal law preempts the Cooley graduates' state-law consumer law and tort claims. We need not reach this argument given that we **AFFIRM** the district court's judgment.