Vernon Lee **HANES**, Appellant,

v.

**TWIN GABLE FARM, INC.,**
Respondent.

No. WD 37387.

Missouri Court of Appeals,
Western District.

June 3, 1986.

Motion For Rehearing and/or Transfer
to Supreme Court Denied
July 24, 1986.

Application to Transfer Denied
Sept. 16, 1986.

Christopher P. Raynes (Pickett & Raynes, Trenton, of counsel), for appellant.

A.V. McCalley (McCalley and Gorham, Richmond, of counsel), for respondent.

Before PRITCHARD, P.J., SHANGLER, J., and NORMILE, Special Judge.

PRITCHARD, Presiding Judge.

About March 15, 1976, plaintiff purchased from defendant an Angus bull, "Farview 323 7403538" for $1,100. He filed his petition alleging fraud in the misrepresentation that Farview was "a good breeder, capable of raising weaning weight and overall weight", and further that "the bull was not a good breeder, but was and is sterile". Trial of the case was had before a jury which returned a verdict for $10,000 actual and $2,500 punitive damages. The trial court, then the Honorable James S. Stubbs, set aside the verdict for actual damages and ordered a new trial on that issue alone. It is said in the briefs, and was stated in oral argument, that the verdict for punitive damages was satisfied by defendant, so no issue is presented thereon.

Retrial of the actual damage issue was had to the trial court sitting without a jury, and resulted in a judgment for plaintiff for $130.13, finding that plaintiff's proof was insufficient with respect to his claims for lost calf crop, herd imbalance and incidental expense damages. Plaintiff here claims that the finding was in error in that he showed by competent evidence and with reasonable certainty that he sustained such loss as a result of fraudulent misrepresentation, and the damages were shown in the precise amount.

Plaintiff, a lifelong cattle and crop farmer in Grundy County, Missouri, turned Farview into a 40 acre pasture with a herd of 83 cows on May 28, 1976, and left him there for 6 weeks, so he could keep back the heifers sired by Farview, this being the reason he bought him. On July 17, 1976, another bull was placed with the herd which had been culled to 75 cows with the two bulls, and thereafter another bull was placed with the herd. At that time plaintiff had a herd of 129 cows, 125 of which had had calves the previous season, and 4 older

cows had been sold before they had calves—plaintiff did not know whether the cows were pregnant when sold.

During 1975, and in January, February and March of 1976, plaintiff had no health problems with his herd. It appears to be conceded by respondent that Farview was sterile during the time in question.

Plaintiff testified that at the time he turned Farview in with the 83 cows, 63 of them had calved. It normally takes a cow about two months before she will begin to have heat periods after the birth of a calf. It is not shown when, in 1976, the 63 cows had calved, so that the two month period of time before they would have become in heat could be computed precisely to accord with the time that Farview was with the herd—six weeks after May 28, 1976, or as plaintiff says, for 50 days. Plaintiff, however, did testify that on May 28, 1976, possibly 52 of the 63 cows (which had calved) were then coming into heat, but "there wasn't even that many, more like 35 to 40". This latter figure accords with plaintiff's testimony that 37 of the cows did not become pregnant by Farview during the six-week or 50–day period, and did not have calves in the spring of 1977. On the other hand, 38 of the 75 cows did have calves, and counting back about 280 days as the gestation period, they must have become impregnated after July 17, 1976, by the two other bulls placed with them: 5 calves born in May, 1977 (impregnation in August, 1976); 13 calves born in June, 1977 (impregnation in September, 1976); 12 calves born in July, 1977 (impregnation in October, 1976); and 8 calves born in August, 1977 (impregnation in November, 1976). It thus appears that Farview was responsible for the 37 cows being barren, and thus plaintiff lost the calf crop, or profits from them. Of these 37 cows, 30 produced calves in 1978, seven of them having been sold, and the 30 cows also produced calves in 1979 and 1980.

In establishing his damages for the lost calf crop, or loss of profits, plaintiff testified that he was familiar with the market prices and figured the average weight per calf at weaning time at 400 pounds (a lesser weight than they always go), and the market price of $67.50 per 100 pounds as coming to $270.00 per calf. He testified that in selling the calves at weaning time no cost of feed is entailed, which would be the case if they were held longer, and there would then be costs of vaccinations, also. Thus, it would appear that plaintiff's total damage was shown with reasonable certainty to have amounted to $9,990.00.

 Although defendant cites many cases such as *Coonis v. Rogers,* 429 S.W.2d 709 (Mo.1968), and *Lewis v. Hubert,* 532 S.W.2d 860 (Mo.App.1975), holding that lost profits, prospectively, from a commercial business are not recoverable because they are too remote, speculative and dependent upon changing circumstances, they are not applicable to the facts of this case. Here, plaintiff was clearly damaged by the failure of the sterile bull, Farview, to impregnate 37 cows during the 1976 season, a one-time tort arising out of the misrepresentation of Farview's ability. Plaintiff was familiar, based on his experience, with cattle breeding operations, the sale of calves at their weaning times, their average weights at that time, and the market price thereafter, in 1977–78, when the calves would have been sold. The loss of the calf crop, or the loss of profit therefrom upon sale of calves at weaning time, occasioned by reason of Farview's sterility, was established by plaintiff so that a trier of fact could ascertain the damages with reasonable certainty, without speculation or conjecture. *Ohlendorf v. Feinstein,* 670 S.W.2d 930 (Mo.App.1984), establishes rules which govern this case. At page 933[1], it is said, "Anticipated profits may be recovered 'only when they are made reasonably certain by proof of actual facts, with present data for a rational estimate of their amount; and, when this is made to appear, they may be recoverable.' [Citing *Coonis v. Rogers,* supra.] The requirement for proof of loss of profits is not absolute certainty, but only a sufficient factual basis such that the estimate of the loss is not based upon speculation or conjecture.

*Swiss-American Importing Co. v. Variety Food Products Co.*, 471 S.W.2d 688, 690[2] (Mo.App.1971)." As noted, defendant's liability for selling the sterile Farview was previously established by jury verdict, and this trial was on the issue of damages only. The *Ohlendorf* case, page 933[2, 3] goes on, "Further, where the fact of damage caused by a defendant's wrongdoing is clear, 'it is reasonable to require a lesser degree of certainty as to the amount of loss, leaving a greater degree of discretion to the jury, subject to the usual supervisory power of the court.' [Citing cases and authority.]" See also *Dick v. Puritan Pharmaceutical Co.*, 46 S.W.2d 941, 945[3] (Mo.App.1932). The failure of the 37 cows to conceive, and the loss of the calf crop and profts therefrom, was directly traceable to and flowed from defendant's wrongful act in selling the sterile bull. It was not necessary, as defendant contends, for plaintiff to show his entire farming income and expenses. His loss was only applicable to a portion thereof— the loss of the calf crop and the profit thereof. See *Orr v. Williams*, 379 S.W.2d 181 (Mo.App.1964), holding that the owner of a damaged tractor-trailer unit was not required to encompass all phases of his business, but could testify as to loss of profits on his single tractor-trailer unit.

■ Although the matter has not been raised by any party to this appeal, it has been suggested by some members of this court that in this fraud action, perhaps plaintiff may not recover the difference in actual value of Farview as represented to be a good breeder and his actual value at the time, and also consequential damages, i.e. the loss of the 1977 calf crop caused by Farview's sterility. The suggestion apparently could come from the statement in *Salmon v. Brookshire*, 301 S.W.2d 48, 54[7] (Mo.App.1957), "It is well settled in this State that generally the proper measure of damages recoverable in a tort action for fraud and deceit whereby the fraud has induced a contract or transaction arising from commercial dealings with real or personal property, such as a sale or exchange, particularly where the fraud af-

fects the value of the property dealt with, and where such property is retained by the one defrauded, is the difference between the actual value of the property at the time purchased and the value it would have had had the representations been true. (Citing cases.)" See also the cases collected at 22 Mo.D.2d, p. 459, et seq., West Key Nos. 59(1) and 59(2), Fraud. The facts in the Salmon case were that plaintiff paid $600 for a Hereford cow represented by defendant to have been registered, and her unregistered value was about $180, or $192, a difference of $408, or $420. There was evidence that the cow had given birth to three calves, the first of which was worth only $125, but would have been worth $250 if registered, and two other calves were worth half as much unregistered as they would have been if registered or eligible for registration. The jury returned a verdict for $1,200 for actual damages, and thus it is obvious, even considering the value of the three calves, that the verdict exceeded the proof, and a new trial was warranted on that basis alone. The court, however, granted a new trial because of error in the giving of Instruction No. 5, in that it did not entail the jury's consideration to the difference in value of the cow as represented as being registered, and its actual value. It is important to note the Salmon court's per curiam opinion on motion for rehearing, wherein it recognized the broad general rule stated in 37 C.J.S. Fraud, § 141, p. 465, "The general rule, in cases of fraud or deceit, is that defendant is responsible for those results, injurious to plaintiff, which must be presumed to have been within his contemplation at the time of the commission of the fraud, and plaintiff may recover damages for any injury which is the direct and natural consequence of his acting on the faith of defendant's representations." And, following this is 37 C.J.S. Fraud, § 143(e), p. 488, where it is said, "Where property is sold for a particular purpose and the seller misrepresents its fitness for such purpose, he is liable for all damages proximately caused by its unfit-

ness for the purpose for which it is purchased, as where a bull is sold for breeding purposes and damages are allowed for his impotence, * * *." Under the latter citation, there is only one ancient footnoted case, *Maynard v. Maynard*, 49 Vt. 297 (1877), where defendant fraudulently concealed that a bull which plaintiff wanted to put with his cows was without the power of propagation. At page 301, it was said, "In cases of this kind, the rule of damages is not as claimed by the defendant, the difference between the market value of the animal as he was in fact, and as he ought to have been to have answered the conditions of the sale, although such difference may be an element of damage, and sometimes the only element. When the vendor makes a sale for a particular purpose, and is guilty of defrauding the vendee in respect to the fitness of the thing for that purpose, he is liable to the vendee for all the damages which result directly from using the commodity for the contemplated purpose." In *Peak, et al. v. Frost*, 162 Mass. 298, 38 N.E. 518, 519 (1894), a stallion was bought by plaintiffs as a breeding horse, they being induced to purchase it by false representations respecting its fitness for the purpose. The question was whether in addition to the difference in value, plaintiffs could recover the expense of keeping the horse a reasonable time to test it, which was answered in the affirmative, saying: "The horse was bought by the plaintiffs for a specific purpose, known to the defendant, and he is liable to the plaintiffs for all the damages resulting naturally and directly to them from its unfitness for that purpose, or for such as may reasonably be presumed to have been within the contemplation of the parties when the contract was entered into as a probable result of the defendant's misrepresentations." In *Dwyer v. Redmond*, 100 Conn. 393, 124 A. 7, 13[21] (1924), upon a counterclaim for deceit in the sale of a truck, misrepresented to be fit for defendant's business, the court said, "Where damage exceeding the ordinary damage allowed in actions founded on fraud are incurred by a plaintiff of which the representations are the proximate

cause, he can recover such consequential damages. (Citing cases.) This is especially true where the representation is made respecting the fitness of the chattel sold for an intended use." (The *Dwyer* case was reversed and remanded for failure to charge the jury as to the difference between the actual value of the truck at the time of sale and what it would have been worth had it been as represented.) Compare *Young v. Van Natta*, 113 Mo.App. 550, 88 S.W. 123 (1905), which went to trial on an express warranty of a bull's suitability for breeding purposes, that being the disclosed intended use by the buyer. The court held that in addition to the difference in value as warranted and its actual value, the buyer could recover interest, expenses in shipping the bull, and medical expenses employed in an effort to restore it to health. Compare also the rule of allowance of consequential and special damages occasioned by the fraudulent sale of diseased animals, including cost of extra care, attention and feed necessitated by the disease, as well as expenditures for medical care and treatment, veterinarian services, drugs, medicines, and damages for the spreading of the disease to other animals of the buyer. See the annotation, 87 A.L. R.2d 1317, 1353, § 8[b], collecting many cases holding that consequential damages, including damages for death of other animals infected by the disease, are allowable. Note the analogous case of *Baden v. Curtiss Breeding Service*, 380 F.Supp. 243 (D.C.Mont.1974), a case under UCC § 2–715, where a buyer sought to recover damages for the loss, due to defective semen sold for artificial insemination, of calf crops for 1972 and 1974, the court holding that he could recover for the 1972 calf crop, but not the 1974 calf crop, the latter because the measurement of consequential damages was too uncertain. Anno. "Sale—Incidental and Consequential Damages," 96 A.L.R.3d 299, 406.

The Salmon case, supra, and the case following it, *Miller v. Wilson*, 381 S.W.2d 31 (Mo.App.1964), are to be distinguished under the foregoing authorities, in that

there was not, in either case, a disclosure of the purpose for which the animals were purchased, and a false representation that the animals were fit for a particular, special purpose. All there was in the cases was a false representation that the animals were registered, hence the limitation of recovery to the "benefit of the bargain" rule of damages.

Under *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976), it must be held that the trial court's findings and conclusions were, on the issue of lost calf crop in 1977, against the weight of the evidence, and it misapplied the law under the facts as to certainty of the proof of damages. That portion of the judgment must therefore be reversed.

Plaintiff next sought to prove damages occasioned by the sterility of Farview in 1976 which threw 38 cows in imbalance as to usual time of impregnation, calving and marketing of calves over a four-year period after 1976. These 38 cows were impregnated by the two replacement bulls late in 1976, and as noted above, they calved from May, 1977, through August, 1977. Plaintiff figured a time after calving of about two months for a cow to come into heat. It was his farming operation and plan to turn in Farview and other bulls with the herds so that the cows would start calving around the first of March in the next year, which would result in the calves' weaning around the first of December of each year. That would eliminate the necessity of carrying calves on cows through the winter. According to plaintiff, the time required to get his herd back into balance is based upon the heat cycle of a cow, how often a cow comes into heat during which she can become pregnant, and the gestation period for cattle, which is about 280 days. The heat cycle on a cow is every 21 days, which means that once a cow starts its cycle and is not bred within that 21 days, somewhere around 21 days later, the cow will come back into heat. Plaintiff concludes that after May 28, 1976, 52 of the 83 cowherd with which Farview was placed were then coming into heat and could have been impregnated by him, but were not. During that time, the 52 cows would have gone through at least 2 or probably 3 heat cycles.

It seems to be plaintiff's argument that because Farview was not a good breeder, his herd of cows were calving at irregular times throughout the year, and was completely out of balance, and it would take four years to get the herd back into balance. This four-year period is apparently based upon the fact that a cow gains a heat cycle of roughly 21 days per year. For the first year (1977–78), plaintiff says his damages were $5,000.00, which is based upon a weight loss of calves of 2 pounds per day each, which would cut the weight loss per calf of 200 pounds. The market price for the calves at weaning time was $67.50 per hundred weight. Thus, as testified by plaintiff, if all the calves had been weanable in the 1977–78 season, the damages were computable at $135.00 per calf, which for 38 calves would amount to $5,050.00. The record, however, shows that 10 cows were out of balance at the time Farview was with them, they not having calved, so the late calving of these 10 cows would not be attributable to Farview. Furthermore, 3 calves died of feed poisoning in 1977, and 4 drowned in a pond, so 17 of the calves should have been deducted for the claimed 38, leaving 21.

Presumably, these 21 calves were held beyond their normal weaning and sale time, possibly 81 days. It is not shown by the record whether they were actually sold later on or for what market price. Plaintiff did testify that when calves are held beyond normal weaning time, they have to be fed. These 21 calves are not said to have been a total loss. Therefore, plaintiff's damages should properly be the difference between their market value at the normal time of weaning and sale at usual weights, and the amount received at a later time at the then market price and weights, plus the cost of feed and other expenses incurred in bringing them up to sale weight. Plaintiff failed to present proper evidence as to his damages for even the

first year of herd imbalance. As to the three subsequent years, it would be speculation as to how many of the cows were still in imbalance, or whether they would have had calves which would have survived to weaning times. No market price at normal weaning times, how many calves actually had to be held over and fed, and at what prices they were sold for, was established. It would be pure speculation and conjecture to assume any of these missing essential facts. The trial court did not err in denying damages for herd imbalance. Coonis v. Rogers, supra.

The trial court gave plaintiff damages of $130.13, the difference between Farview's value as represented, $1,100.00, and his actual value at the time of purchase, $969.67. Plaintiff discovered that Farview was sterile after the first six weeks that the cows should have started calving, but he did not have a calf. He pregnancy checked an indeterminate number of cows in the spring of 1977, and found two or three were maybe pregnant, and the majority were not. In early February, 1977, plaintiff noticed cows in the Farview herd that were in heat, and admitted that he should have noticed it before, but did not. He notified defendant that there was a problem with Farview in March or April, 1977.

■ Plaintiff, nevertheless, kept Farview for about a year after he was discovered to be sterile. He does not demonstrate why he was entitled to be paid $1.50 per day, as claimed, for his feed during that time, or any length of time. The trial court did not err in denying the claim for Farview's feed.

Those parts of the judgment denying damages for claimed herd imbalance, and for Farview's feed costs, are affirmed. That part of the judgment denying the claim of loss of calf crop, or profit therefrom, is reversed and the case is remanded with directions to enter judgment for plaintiff against defendant in the amount of $9,990.00, plus $130.13 for the difference in

value of Farview, as found by the trial court, a total of $10,120.13.

All concur.