

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| JENNIFER KERR, | ) | |
| | ) | WD76903 |
| Respondent, | ) | |
| v. | ) | OPINION FILED: |
| | ) | |
| VATTEROTT EDUCATIONAL | ) | August 26, 2014 |
| CENTERS, INC., | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
**Honorable Jack Richard Grate, Judge**

**Before Division Three: Gary D. Witt, P.J.,**
**Joseph M. Ellis, and Thomas H. Newton, JJ.**

Vatterott Educational Centers, Inc., doing business as Vatterott College (Vatterott), appeals the trial court's judgment in favor of Ms. Jennifer Kerr. Ms. Kerr sued Vatterott for damages under the Missouri Merchandise Practices Act (MMPA), sections 407.010 to 407.130.[1] A jury found Vatterott liable to Ms. Kerr for its deceitful practices in selling a certain educational program offered by its institution. The jury awarded Ms. Kerr compensatory and punitive damages. On appeal, Vatterott challenges the denial of its motion for a directed verdict, the submission of a certain damages instruction, and the amount of the punitive damages award. We affirm and remand.

---

[1] Statutory references are to RSMo 2000 and the Cumulative Supplement 2008, unless otherwise stated.

**Factual and Procedural Background**

In late 2008, Ms. Kerr decided to return to school to become a registered nurse. In 2009, a representative at Concorde College spoke to Ms. Kerr, during a campus visit, and informed her that the institution did not offer a Nursing Program, but offered a Medical Assistant Program (MA Program). Ms. Kerr felt that the MA Program would not assist her in pursuing a nursing career, so she left. She then contacted Vatterott to determine what programs it offered.

In 2009, Vatterott's catalog advertised two medical programs: (1) MA Program and (2) Medical Office Assistant (MOA) Program. The MA Program was described as a 90-week program, during which students received administrative and clinical training; the MOA Program was described as having a duration of 60 weeks, during which students learned only "administrative clerical duties." At the time, the MA Program cost $33,100, and the MOA Program cost $22,300.

Ms. Leah Lehman, a Vatterott admissions coordinator, met with Ms. Kerr in her office in March 2009. Ms. Kerr told Ms. Lehman that she wanted to become a registered nurse and that she was a single mother who needed to work. Ms. Lehman told Ms. Kerr that Vatterott did not have a nursing program, but had a "condensed" MA Program. Ms. Lehman told Ms. Kerr that she would get "more [there] faster," that "everything [she would] get in medical assisting wa[s] the same as [the classes] in nursing," and that she could take the credits with her and "get done faster." Additionally, Ms. Lehman told Ms. Kerr that she could earn money working as a medical assistant while pursuing her nursing

2

degree. Ms. Lehman tried to get her to enroll right away, but Ms. Kerr told her that she would think about it.

Soon after, Ms. Kerr returned to Vatterott and again spoke to Ms. Lehman. Ms. Kerr enrolled later that day. Ms. Kerr did not receive a catalog that day, but she had seen one the first day that the MA Program was explained to her. She inquired about the letters, "MOA," appearing before the course numbers in the catalog listings under the MA Program, and Ms. Lehman told her they stood for the "Medical Office Assistant" Program, which was "one in the same." Around the same time, Ms. Lehman told Ms. Kerr that the MA Program was about $21,000; she was also shown a lab fee of $1,200.

Ms. Lehman gave her a tour of the facility, showing Ms. Kerr the classrooms and the technological lab. She told Ms. Kerr that her hands-on training for the clinical part of the MA Program would occur in the lab. Ms. Lehman filled out the enrollment contract for the MOA Program, slid the contract to Ms. Kerr, and told her where to sign it. Ms. Kerr complied.

Ms. Kerr was then sent to meet with one of Vatterott's financial aid advisors, Ms. Barbara Boone. With Ms. Boone's help, Ms. Kerr obtained federal loans and grants to finance her education. At this time, neither Ms. Lehman nor Ms. Boone told Ms. Kerr that she would need to pay an additional $10,000 to participate in the clinical portion of the MA Program. A month later, Ms. Kerr filled out an orientation document and began the program a few days later.

3

Just before completing the MOA Program,[2] Ms. Kerr was told to report to the financial aid office because she was on a list to proceed to the MA Program. Ms. Kerr, along with her classmates, was upset because she and they believed that they all had already enrolled in and paid for the MA Program. Once in the office, Ms. Boone told Ms. Kerr that her financial aid had covered only the MOA Program and that she needed to take out an additional loan to pay for the MA Program or "drop." Ms. Kerr told Ms. Boone that she would think about it.

Ms. Kerr addressed her concerns with Ms. Stephanie Hankins, the Director of the Medical Program at the time, about being misled into believing that the clinical portion was included in the program in which she had already enrolled and financed. Ms. Hankins told her that none of her classes would transfer into nursing. Afterward, Ms. Kerr declined to enroll in the MA Program. She finished her last phase of the MOA Program from home. In 2010, she graduated with a Certificate of Completion rather than an Associate of Occupational Studies, which she would have received if she had enrolled in and completed the MA Program. Ms. Kerr was unable to obtain a job in the medical field with the certificate, nor could she use the credits toward a nursing degree.

In May 2012, Ms. Kerr sued Vatterott for compensatory (actual) and punitive damages, alleging that Vatterott had "engaged in unlawful merchandising practices in violation of the [MMPA]." Specifically, Ms. Kerr alleged that Ms. Lehman's statements and conduct toward Ms. Kerr exemplified Vatterott's "pattern and practice of using

---

[2] The program was comprised of phases that served as semesters. Each phase would start new classes. The entire MOA Program consisted of six phases for a total of sixty weeks. The MA Program consisted of an additional three phases for a total of ninety weeks.

4

deception, fraud, false pretense, false promise, misrepresentation, and unfair practices in connection with the sale or advertisement of merchandise."

At the jury trial, Ms. Kerr testified to the above facts. Ms. Kerr also testified that she used the technology lab only two or three times during the 60-week period and that her Vatterott education had zero value. Additionally, former Vatterott graduates testified to similar experiences with enrollment and later discovering that the MA Program was separate and required an additional fee. Former Vatterott employees testified that those admission practices were common and top Vatterott employees were made aware of them, as early as 2007. Ms. Lehman's former supervisor, the Director of Admissions from 2009 to 2011, testified that Ms. Lehman was terminated due to dishonesty concerning an application. She further testified that a student could not enroll in the MA Program without first completing the MOA Program, although it was represented that way. Ms. Hankins, the former Director of the Medical Program, also testified that Vatterott merged the MOA Program into the MA Program in 2010. She also testified that Vatterott's advisory board suggested years earlier that the MOA Program be removed. Ms. Kerr adduced evidence that she owed $27,962.23 in student loans.

Vatterott adduced evidence from employees and former employees in an attempt to contravene the evidence of unfair practices in admissions. One of Vatterott's career services employees testified that the benefit of the Certificate of Completion to its holder was that he or she was the more attractive applicant for office positions as compared to an applicant without one. At both the close of the plaintiff's case and at the close of evidence, Vatterott moved for a directed verdict. The trial court denied both motions.

The jury returned a verdict in favor of Ms. Kerr. It awarded her $27,676.96 in actual damages and $13,000,000 in punitive damages. The trial court entered judgment to reflect the verdict. Several post-trial motions were filed. As a result, the trial court amended the judgment to award Ms. Kerr $27,696.96 in actual damages, $2,078,679.80 in punitive damages,[3] and $388,059.00 in attorney fees. Vatterott appeals.

**Legal Analysis**

Vatterott raises four points. In the first and second points, Vatterott argues that the trial court erred in denying its motion for directed verdict and entering judgment against it because Ms. Kerr did not have a submissible MMPA case. First, Vatterott asserts that the MMPA claim was not submissible to the jury because Ms. Kerr did not "purchase her education primarily for personal, family[,] or household purposes," as required under MMPA. Second, Vatterott asserts that there was no submissible MMPA claim of deception or causation because the contemporaneous documents that Ms. Kerr signed "fully disclosed the truth."

In reviewing the denial of a directed verdict motion, we are limited to determine whether a submissible case was made. *Kelly v. State Farm Mut. Auto. Ins. Co.*, 218 S.W.3d 517, 520 (Mo. App. W.D. 2007). In doing so, we view the evidence and all reasonable inferences from it in the light most favorable to the plaintiff and disregard all contrary evidence. *Oliver v. Ford Motor Credit Co., LLC,* Nos. WD 75585 & WD 75619, 2014 WL 1711490, at *2 (Mo. App. W.D. April 29, 2014). However, our review

---

[3] Statutory cap caused the reduction. See §510.265.1 ("No award of punitive damages against any defendant shall *exceed the greater of* (1) Five hundred thousand dollars; or (2) Five times the net amount of the judgment awarded to the plaintiff against the defendant." ).

6

becomes *de novo* when "the denial of a directed verdict is based upon a conclusion of law." *Id.* A submissible case is made if the plaintiff has presented "substantial evidence for every fact essential to liability." *Kelly*, 218 S.W.3d at 520. "[W]e will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion. Thus, '[a] directed verdict is inappropriate unless reasonable minds could *only* find in favor of the defendants.'" *McGinnis v. Northland Ready Mix, Inc.*, 344 S.W.3d 804, 809 (Mo. App. W.D. 2011) (internal quotation marks and citation omitted).

"Civil actions may be brought under the MMPA to recover actual damages by '[a]ny person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of [an unlawful practice].'" *Plubell v. Merck & Co., Inc.*, 289 S.W.3d 707, 711-12 (Mo. App. W.D. 2009) (quoting § 407.025.1). Thus, to prevail, a plaintiff must show that she: "(1) [purchas]ed merchandise from defendant; (2) for personal, family, or household purposes; and (3) suffered an ascertainable loss of money or property; (4) as a result of an act declared unlawful by section 407.020." *Chochorowski v. Home Depot U.S.A., Inc.*, 295 S.W.3d 194, 198 (Mo. App. E.D. 2009).

In the first point, Vatterott claims that Ms. Kerr failed to satisfy the second element of personal purpose because she testified that her education was "worthless because it did not advance her career objectives." Vatterott further claims that because her testimony "establishes that she purchased her education solely to improve her chances of obtaining a job in the nursing field, . . . [s]he specifically disclaimed any purpose to

7

advance her own personal knowledge." Vatterott's reasoning is that, if the *sole* purpose in purchasing an education was to advance a career, it cannot constitute a purchase for "primarily personal, family, or household purposes." Vatterott purports that Ms. Kerr's testimony negates the second element.

Vatterott claims that Ms. Kerr can only have a submissible case if she now argues that her education had value, a position contrary to her damages theory at trial. Vatterott further claims that the law precludes her from doing so, and that her testimony that the education she received had no value would thereby defeat her claim. Vatterott relies on cases from other jurisdictions to support its proposition that, "[a]s a matter of law, an education undertaken solely to enhance one's career prospects is not 'primarily for personal, family or household purposes.'" We have read the cases, and we find that they are distinguishable from the facts of this case.

Vatterott cites to cases in which the courts found that evidence showing a plaintiff using a purchased tangible item for a business purpose negated the element of personal use. *See, e.g.*, *In re Jenkins*, 249 B.R. 532, 536-37 (Bkrtcy. W.D. Mo. 2000) (stating failure to use the truck after it failed in business showed that it was not purchased for personal use). In this case, the merchandise at issue—an education—is intangible and has no objective use. Vatterott also cites to cases in which the courts found against claims under consumer protection laws similar to the MMPA because the allegations in the pleadings mainly stated that the plaintiffs intended to use the education to better themselves by obtaining jobs in their respective fields. *See, e.g.*, *MacDonald v. Thomas M. Cooley Law School*, 724 F.3d 654, 661-62 (6th Cir. 2013). Here, a trial was had, at

8

which Ms. Kerr presented evidence besides her failure to secure the promised employment that her education was worthless. Consequently, Vatterott's cited cases are inapposite.

Ms. Kerr asserts that the contract itself states that the education was purchased for personal use, so the contract entitles her to sue under the MMPA. She relies on the Federal Trade Commission (FTC) Consumer Notice mentioned in Paragraph 16 of Vatterott's enrollment contract, which states:

> Any holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services pursuant hereto or with the proceeds hereof.

She claims that the presence of the language in the contract implies that the education was purchased for personal use because "consumer," as defined under 16 C.F.R. § 433.1(b) of the FTC, is "a natural person who seeks or acquires goods or services for personal, family, or household use." For additional support, she cites to *Maldonado v. Collectibles International, Inc.*, which found that vocational training was a consumer service. 969 F.Supp. 7, 9 (S.D.N.Y. 1997). In so concluding, the *Maldonado* court provided that the FTC defines "consumer goods and services" to include "courses of instruction or training regardless of the purpose for which they are taken." *Id.* (quoting 16 C.F.R. § 429.0(b)).

In deciding the matter before us, we are cognizant that "[t]he purpose of [MMPA] is to preserve fundamental honesty, fair play and right dealings in public transactions." *Plubell*, 289 S.W.3d at 711 (internal quotation marks and citation omitted). We have found no Missouri cases addressing whether obtaining an education is implicitly for a

9

personal purpose or whether it depends on the stated or demonstrated primary purpose by the consumer. Nor have we found cases that state the presence of an FTC Consumer Notice, which is guided by the Truth in Lending Act (TILA), overrides any stated contrary, primary purpose for the good. *Cf. Drew v. Chrysler Credit Corp.*, 596 F.Supp. 1371, 1374-75 (W.D. Mo. 1984) (performing a purpose analysis in determining whether an automobile was a consumer good, even though the retail installment contract contained an FTC Consumer Notice).[4]

Whether a plaintiff purchased a good for primarily a personal, family, or household purpose is a question of fact. *See Chrysler Fin. Co., L.L.C. v. Flynn*, 88 S.W.3d 142, 150 (Mo. App. S.D. 2002) (stating that whether a good is a "consumer good" under Missouri law is a jury question). Because Ms. Kerr provided other reasons for purchasing the education, we do not need to decide whether purchased education, regardless of its intended use, is deemed purchased primarily for a personal purpose under section 407.025.1.

Ms. Kerr testified that she wanted to become a registered nurse. She claimed that she purchased the Vatterott education for those credits to apply toward a nursing degree. In the *MacDonald* case relied on by Vatterott, the Sixth Circuit distinguished between obtaining an education to make money and obtaining an education for the sake of

---

[4] The *Drew* court made a distinction between the phrase, "consumer goods," as defined in Uniform Commercial Code, which focuses on buyer's intent, and the definition of the phrase under the Federal Trade Commission (Truth in Lending Act) and section 408.400.1(2) of the Missouri Revised Statutes, which focuses on the good's primary use. *Drew v. Chrysler Credit Corp.*, 596 F.Supp. 1371, 1374-75 (W.D. Mo. 1984).

receiving it. 724 F.3d at 661-62.[5] It suggested that the latter would be for a personal purpose. *Id.* Thus, although Ms. Kerr presented evidence that the Certificate of Completion lacked value because she could not obtain a job; other evidence suggested that the education was valueless because it did not count toward her nursing degree. As the trial court found, "the jury could have reasonably inferred from the evidence that the purpose for the purchase was primarily for personal use." Vatterott's first point is denied.

In the second point, Vatterott argues that Ms. Kerr failed to satisfy MMPA's causation element because she cannot show deception or a causal connection when the evidence shows that she signed or initialed contemporaneous written documents disclosing the truth. Specifically, Vatterott argues that these documents negate the deception or a causal connection element because each reflects that Ms. Kerr enrolled in the MOA Program, which is different from Ms. Lehman's alleged oral representations to Ms. Kerr that she was enrolling in the MA Program.

Vatterott acknowledges that under the standard of review, we must disregard evidence contrary to the jury verdict such as these written documents. However, Vatterott claims that we are "not free to disregard unambiguous contemporary documents that are plainly inconsistent with the plaintiff's theory of the case." In so arguing, Vatterott cites *Kelly* for support. In *Kelly*, a jury found in favor of the plaintiffs against the defendant for wrongful termination of an agency agreement. We found that the agreement was not ambiguous and plainly allowed for either party to terminate the

---

[5] See *Sibeto v. Capella University*, which disagrees with this reasoning. 2014 WL 3547344, at *1 (W.D. Pa. July 17, 2014).

11

agreement at will or without cause. S.W.3d at 522. We thus concluded that the defendant did not breach the agreement and that the trial court should have granted the motion for JNOV on the breach of contract claim. *Id.* at 523-24.

In MMPA cases, "[t]he rule that all prior and contemporaneous oral agreements and representations are merged in the written contract entered into by the parties does not apply." *Riley v. Lucas Lofts Investors, LLC,* 412 S.W.3d 285, 292-93 (Mo. App. E.D. 2013). "[T]he [MMPA] prohibits the use of any misrepresentation or deception in connection with the sale. If such misrepresentations or deceptions are made, the statute has been violated whether or not the final sales papers contain no misrepresentation or even correct the prior misrepresentation. *State ex rel. Webster v. Areaco Inv. Co.*, 756 S.W.2d 633, 636 (Mo. App. E.D. 1988). The trial court did not err in disregarding the written documents when it denied Vatterott's motion for JNOV.

Vatterott claims that the Missouri Supreme Court applied the rule that "the written instrument trumps the oral misrepresentations" in the MMPA case, *Chochorowski v. Home Depot U.S.A.* (*Chochorowski II*), 404 S.W.3d 220 (Mo. banc 2013). We disagree.

In *Chochorowski II*, the alleged MMPA violation was that the defendant had engaged in the specific unfair practice of including a negative option plan, as listed in the corresponding Missouri regulations. *Id.* at 226. Oral misrepresentations were not involved in that claim, only whether the contract charged for merchandise that the plaintiff had not ordered or solicited. *Id.* Looking to the written contract to determine the parties' intent as to the damage waiver provision, the supreme court determined that the plain language in the contract required the plaintiff to affirmatively accept the damage

12

waiver. *Id.* at 227. It further determined that the plaintiff had done so by initialing the box according to the directions therein and signing the contract. *Id.* at 228. It concluded that the practice was fair under "the basic tenets of contract law" that "[a] signer's failure to read or understand a contract is not, without fraud or the signer's lack of capacity to contract, a defense to the contract." *Id.* It further found that the application of the rule in that case did not conflict with legislative intent behind the MMPA. *Id.* As it stands, the merger rule is still inapplicable in MMPA cases.

Here, there were oral misrepresentations in connection with the sale of the merchandise. Substantial evidence showed that Ms. Lehman told Ms. Kerr that she was enrolling in the MA Program, but the truth was that the MA Program was only available to those who had successfully completed the MOA Program. Yet, Ms. Lehman told her the two programs were one in the same. Ms. Lehman did not mention the additional $10,000 fee for the clinical portion. Thus, the fact that the documents signed and initialed by Ms. Kerr revealed that Ms. Kerr actually signed and paid for the MOA Program is of no consequence. Vatterott's second point is denied.

In the third point, Vatterott argues that the trial court erred in giving the MAI 4.01, general damages instruction, as opposed to the MAI 4.03, benefit-of-the-bargain instruction, as is required for MMPA cases. Vatterott claims that, if Ms. Kerr had a submissible MMPA case under the claim that she purchased her education for personal, family, or household purposes, "her testimony proves that the education had some value and her recessionary damage theory is wrong." Vatterott thus requests a new trial to

13

decide the damages and liability determination, as they are "closely intertwined as to make it unfair to limit a new trial to the issue of damages."

Instructional error review is *de novo*. *Peel v. Credit Acceptance Corp.*, 408 S.W.3d 191, 198 (Mo. App. W.D. 2013). We will reverse only if the error served to mislead, misdirect, or confuse the jury and thereby prejudiced the defendant. *Id.*

Broad MAI instructions are not to be used when there is one tailored to address the specific situation. *See Pace Prop., Inc. v. Am. Mfrs. Mut. Ins. Co.*, 918 S.W.2d 883, 887 (Mo. App. E.D. 1996). MAI 4.01 states, in pertinent part, "If you find in favor of plaintiff, then you must award plaintiff such sum as you believe will fairly and justly compensate plaintiff for any damages you believe plaintiff sustained . . . as a direct result of the occurrence mentioned in the evidence." (footnotes omitted). MAI 4.01 is purposefully worded to eliminate "the risk of the jury being improperly instructed on damages not supported by the record." MAI 4.01, *Committee Comment* (2002 Revision); *see also Hedgecorth v. Union Pac. R.R. Co.*, 210 S.W.3d 220, 228 (Mo. App. E.D. 2006). MAI 4.03 states:

> If you find in favor of the plaintiff, then you must award plaintiff such sum as you believe was the difference between the actual value of the (*describe property, such as "the furnace"*) on the date it was sold to plaintiff and what its value would have been on that date had the (*describe property*) been as represented by defendant.

The Notes on Use for MAI 4.03 state that this instruction should be used when the "plaintiff is suing for misrepresentation." However, it also states that MAI 4.01 "should

14

be used" when evidence supports other damages.[6]  MAI 4.03, *Notes on Use*.  Otherwise, applicable MAI instructions must be submitted as instructed.  *Clark v. Mo. & N. Ark. R.R. Co., Inc.*, 157 S.W.3d 665, 671-72 (Mo. App. W.D. 2004) (internal quotation marks and citation omitted).

Vatterott claims that MAI 4.01 was an improper instruction because it did not instruct the jury to award Ms. Kerr the benefit of the bargain and served as a rescission damage instruction.  Rescission damages are provided when a party rescinds the contract by returning the property to the seller, thus entitling that party to a refund.  *Davis v. Cleary Bldg. Corp.*, 143 S.W.3d 659, 668 (Mo. App. W.D. 2004).  Vatterott claims that because Ms. Kerr did not rescind the contract and instead obtained the education, the appropriate measure of damages was the benefit of the bargain.  That method requires findings of the "actual value of the property" purchased and of "what its value would have been if it had been as represented."  *Sunset Pools of St. Louis, Inc. v. Schaefer*, 869 S.W.2d 883, 886 (Mo. App. E.D. 1994).  As set forth above, MAI 4.03 does require the jury to make these findings.

Vatterott cites *Sunset Pools* to support its contention.  In *Sunset Pools*, the defendant argued that the trial court erred in awarding actual damages because the plaintiff failed to prove damages.  *Id.* at 885.  Finding no guidance from section 407.025, the *Sunset Pools* court found that the MMPA claim based on misrepresentation was a

---

[6] The substantive law allows for MAI 4.01 when those damages are inadequate.  "The Missouri Supreme Court has held that MAI and its Notes on Use are not binding to the extent they conflict with the substantive law. If an instruction following MAI conflicts with the substantive law, any court should decline to follow MAI."  *Clark v. Mo. & N. Ark. R.R. Co., Inc.*, 157 S.W.3d 665, 671 (Mo. App. W.D. 2004) (internal quotation marks and citation omitted).  Otherwise, applicable MAI instructions must be submitted as instructed.  *Id.* at 671-72.

15

derivative of common law fraud and looked to applicable remedies. *Id.* at 886. It found that in common law, the measure of damages employed is the benefit of the bargain when the defrauded party decides not to rescind the contract. *Id.* It concluded that because there was no evidence of the value of the spa at the time of purchase, the trial court erred in awarding plaintiff the amount he paid for it because the plaintiff had not rescinded the contract and the amount awarded did not account for the value of the item at the time it was purchased. *Id.* It reversed and remanded the case solely on damages. *Id.*

Vatterott's reliance is misplaced. *Sunset Pools* is inapposite to this case because the purchased good in question was tangible and had value shown by its intended use. *Id.* Under common law fraud, the measure of damages . . . is not limited to the benefit-of-the-bargain method "whe[n] the purchaser rescinds and returns the property received or whe[n] he received nothing of value." *Salmon v. Brookshire*, 301 S.W.2d 48, 54 (Mo. App. 1957). When either exception[7] applies, the buyer is entitled to "the amount . . . paid with interest from the date of payment, plus incidental losses and expenses suffered as a result of the seller's misrepresentations." *Id.*

Although several of our cases have since held that the appropriate method to calculate damages in MMPA claims is the benefit of the bargain, they are not controlling here. In those cases, the buyers did not take the position, as Ms. Kerr does, that the misrepresented good was worthless. *See, e.g., Plubell*, 289 S.W.3d at 711, 715 (plaintiffs

---

[7] In *Hanes v. Twin Gable Farm, Inc.*, 714 S.W.2d 667, 670 (Mo. App. W.D. 1986), we stated that damages are not so limited to the benefit of the bargain when the plaintiff's request for damages includes consequential damages and the evidence shows that the seller misrepresented despite knowing the buyer's intended use of the good, which we noted were not present in *Salmon*.

16

claimed that product was worth *less* than the value represented); *Schoenlein v. Routt Homes, Inc.*, 260 S.W.3d 852, 855 (Mo. App. E.D. 2008) (finding reversible error in failing to submit MAI 4.03 in a case about the failure to include the warranty in a real estate purchase); *Strebler v. Rixman*, 616 S.W.2d 876, 877 (Mo. App. E.D. 1981) (finding reversible error in failing to submit MAI 4.03 to the jury in a misrepresentation case when plaintiffs used the boat); *but see Davis*, 143 S.W.3d at 670 (stating that, on remand, plaintiffs were entitled to actual damages on their MMPA claim and benefit-of-the bargain damages on their fraudulent misrepresentation claim).

Here, Ms. Kerr's request for damages stated that the value of the education was zero; the evidence favorable to her showed that the value of the program was zero. Thus, an exception applies. The Missouri Supreme Court has recognized that "[i]n fraud cases where the benefit of the bargain rule is inadequate, other measures of damages may be used." *Dierkes v. Blue Cross & Blue Shield of Mo.*, 991 S.W.2d 662, 669 (Mo. banc 1999) (citing *Kerr v. First Commodity Corp. of Boston*, 735 F.2d 281, 285 (8th Cir. 1984) (holding that submitting MAI 4.01 instead of MAI 4.03 was appropriate because the evidence did not show that the misrepresented commodities had value or an objective way by which to determine their actual value)). Thus, the trial court did not err in submitting Instruction 7.

Even if the submission were erroneous, Vatterott cannot show resulting prejudice. Vatterott claims that it was prejudiced because it was denied an opportunity to "tie" its argument that Ms. Kerr's education had value "directly to the instruction[]." As Ms. Kerr points out, Vatterott did argue that the education had value to Ms. Kerr and that the jury

17

should consider that in deciding the damages. Although it did not incorporate the instruction into that argument, the broad language of MAI 4.01 would have permitted Vatterott to do so. The trial court did not make a ruling preventing Vatterott from arguing that any awarded damages should be discounted by whatever value[8] Vatterott placed on the education to ensure that Ms. Kerr was "fairly and justly compensate[d]," as opposed to being unfairly and unjustly compensated. Notwithstanding, the jury could have determined the same award under the benefit-of-the-bargain method, if it agreed with Ms. Kerr that the value of her education was zero—a point that Vatterott concedes. Thus, Vatterott cannot show that the jury was misled, or confused by the submission of MAI 4.01 instead of MAI 4.03. Vatterott's third point is denied.

In the fourth point, Vatterott argues that the trial court erred in refusing to amend the punitive damages award because the amount awarded violates "substantive due process, in that it is more than 75 times the actual damages." Vatterott claims that any amount in excess of nine times the actual damages violates the due process under Supreme Court precedent. Vatterott thus requests that the punitive damages award be reduced to $250,000.

This challenge is constitutional. *Estate of Overbey v. Chad Franklin Nat'l Auto Sales N., LLC*, 361 S.W.3d 364, 372 (Mo. banc 2012). Thus, our review is *de novo*. *Id.*

We determine whether a punitive damages award is grossly excessive in violation of the constitution, by analyzing the amount under three factors. *Peel*, 408 S.W.3d at

---

[8] Vatterott claimed that Ms. Kerr's personal enjoyment, as well as her acceptance into St. Luke's program, gave value to her education, but it did not suggest a dollar figure.

18

212. The first factor is "the degree of reprehensibility of the defendant's misconduct." *Id.* The second factor is "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award [proportionality]." *Id.* The third factor is "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.*

Vatterott claims that the degree of the reprehensibility of its conduct was low. "The reprehensibility of defendant's conduct is the most important consideration in determining the reasonableness of a punitive damages award." *Id.* (internal quotation marks and citation omitted). Our concern is with the defendant's misconduct and the harm to the plaintiff. *Estate of Overbey*, 361 S.W.3d at 373. The degree of reprehensibility is determined by considering five factors:

> [1] the harm was physical as opposed to economic; [2] the conduct evinced indifference or a reckless disregard of the health or safety of others; [3] the target of the conduct was financial vulnerability; [4] *the conduct involved repeated actions or was an isolated incident; and* [5] *the harm was the result of intentional malice, trickery, or deceit, or mere accident*.

*Id.* (internal quotation marks and citation omitted).

Vatterott claims that "three of the five factors" that show the likelihood of reprehensibility "point to no liability at all for punitive damages." We disagree. Although there was no evidence that the harm was physical or that it raised any health or safety issues, the evidence showed that Ms. Kerr was financially vulnerable. Ms. Kerr was a single mother who needed to work. The evidence also showed that many of the students were financially vulnerable.

19

Vatterott also claims that the law precludes the consideration of the evidence of the students who shared similar experiences to Ms. Kerr in determining the constitutionality of the punitive damages award. Repeated conduct has been interpreted to mean "evidence of other acts . . . [that are] factually as well as legally similar to the plaintiff's claim." *Heckadon v. CFS Enterprises, Inc.*, 400 S.W.3d 372, 383 (Mo. App. W.D. 2013) (internal quotation marks omitted) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 423 (2003)). The United States Supreme Court held that:

> Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible—although counsel may argue in a particular case that conduct resulting in no harm to others nonetheless posed a grave risk to the public, or the converse. Yet for the reasons given above, a jury may not go further than this and use a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties.

*Philip Morris USA v. Williams*, 549 U.S. 346, 355, 127 S.Ct. 1057, 1064 (2007).

Since that decision, the Missouri Supreme Court has recognized that plaintiffs are entitled to recover punitive damages based on the wrongs done to them rather than on "the alleged wrongs done to others." *Estate of Overbey*, 361 S.W.3d at 379 (citing *State Farm*, 538 U.S. at 419-23 and *Philip Morris USA*, 549 U.S. 356-57). However, the law "permit[s] considering the wrongfulness of the conduct and whether it is part of a pattern and practice of misconduct." *Id.* at 373 (internal quotation marks and citation omitted).

The evidence showed that Vatterott had developed a pattern and practice of deception as to the MA Program. Ms. Lehman, a Vatterott admissions coordinator, induced Ms. Kerr into purchasing a seat with student loans through deceit that the

20

financed education would provide her with a job to repay it when, in actuality, the education from the MOA Program equipped her with a hope to repay it. Ms. Lehman and other admission coordinators had deceived other students in the same manner into believing they were enrolling in the MA Program, a degree program, when, in actuality, they were contractually enrolling in the MOA Program, a certificate program. Vatterott accepted more than $20,000 in student loans per student for the MOA Program, despite knowing the high likelihood that Ms. Kerr and other students would not be able to obtain a job that paid enough to repay the loan and cover their living expenses.

Vatterott's career services employee knew that the job market was tight for certificate holders, and Vatterott's advisory board members, comprised of prospective employers, suggested that the programs be combined because employers wanted employees who were trained for both the clinical and office portions. Notwithstanding, Vatterott continued to advertise two separate programs, although the MA Program depended on the student's success in the MOA Program. Vatterott also knew (prior to and after Ms. Kerr's discovery) about the affirmative misrepresentations to students who were enrolled in the MOA Program, but did not resolve the issue. Combining the programs into one degree program in 2010 reduced the tuition from approximately $33,100 to $29,750, a difference of almost $4,000. This was egregious conduct.

As to proportionally, Vatterott claims that the double-digit-ratio between the compensatory and punitive damages awards was improper because under the law an award is unconstitutional if it exceeds nine times the actual damages. Ms. Kerr asks this court to find, in line with other jurisdictions, that attorney fees are included in actual

21

damages, which would result in the punitive damages equaling only five times the amount of compensatory damages. Vatterott claims that attorney fees are excluded from the assessment used to determine the ratio, as set forth in Missouri precedent. Contrary to Vatterott's assertion, Missouri courts have not addressed whether attorney fees are considered actual harm for purposes of the proportionality assessment.[9] We decline to decide the matter.

The awards here clearly exceed a single-digit ratio but that does not render the punitive damages award unconstitutional, although a violation of due process is more likely found in such a case. *See Philip Morris*, 549 U.S. at 352 (citing *State Farm*, 538 U.S. at 425). "[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 425. "Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those [upheld by the Supreme Court] may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages." *Id.* (internal quotation marks and citation omitted). "[I]n the case of small awards, due process does not prevent large ratios if necessary, given particular facts, to impose punishment and deter future misconduct." *Estate of Overbey., LLC*, 361 S.W.3d at 373-74. As we previously found, Vatterott engaged in egregious conduct. Vatterott collected more than $20,000, comprised primarily of

---

[9] Section 510.265.1 states, in pertinent part, "No award of punitive damages against any defendant shall *exceed the greater of* (1) Five hundred thousand dollars; or (2) Five times the net amount of the judgment awarded to the plaintiff against the defendant." *Estate of Overbey v. Chad Franklin Nat'l Auto Sales N., LLC*, 361 S.W.3d 364, 370-71 (Mo. banc 2012) (internal quotation marks and citation omitted). "The net amount of the judgment" includes attorney fees and compensatory damages. *See Hervey v. Mo. Dep't of Corr.*, 379 S.W.3d 156, 165 (Mo. banc 2012).

student loans, from several students for years after it had been notified that certificate holders were not marketable and that several students were deceived into believing that they had enrolled in the degree program as opposed to the certificate program. The amount is thus justified to deter and punish, considering the egregious conduct and the small award.

Finally, Vatterott claims that the award is excessive because the MMPA provides a civil penalty that is significantly less than the punitive award against it. Thus, according to Vatterott, the penalty in this case would be $2,000 for the two aforementioned misrepresentations. Section 407.100.6 provides for a $1,000 fine for each violation to be collected by the attorney general on behalf of the State of Missouri. This civil penalty does not address misconduct similar to Vatterott's. Instead, it addresses violations of orders by the court of either injunctions or monetary damages. *See* §§ 407.100.5, 407.100.6. We also find unpersuasive Vatterott's comparison of its behavior to that found in section 570.140, a criminal statute that punishes deceptive business practices. Consequently, the punitive damages award was not "grossly excessive." Vatterott's fourth point is denied.

Ms. Kerr filed a motion for attorney fees on appeal, which we took with the case. In her motion, she asks that we award her appellate attorney fees and that we "reset the punitive damages at five times the net amount of the judgment" pursuant to section 510.265.1 (punitive damages cap) by adding the award of appellate attorney fees to the "net amount." Attorneys are entitled to attorney fees on appeal from MMPA actions. *See Berry v. Volkswagen Group of Am., Inc.*, 397 S.W.3d 425, 433 (Mo. banc 2013)

(citing section 407.025.2 as support for granting appellate attorney fees in an MMPA action). We believe "the trial court is better equipped to hear evidence and argument on this issue and determine the reasonableness of the fee requested." *Id.* (internal quotation marks and citation omitted). We thus grant the request for attorney fees and remand the cause to the trial court to determine a reasonable award. As for the request to increase the capped amount of punitive damages, we deny it. Section 510.265.1 concerns "the net amount of the judgment awarded to the plaintiff," which our supreme court has interpreted to include an award of attorney fees in the trial context. *See Hervey v. Mo. Dep't of Corr.*, 379 S.W.3d 156, 165 (Mo. banc 2012). Ms. Kerr's arguments have not convinced us that we should extend this holding to include attorney fees on appeal.

## Conclusion

Therefore, we affirm the trial court's judgment and remand the cause to the trial court to determine the appropriate amount of appellate attorney fees and to enter judgment accordingly.

/s/ THOMAS H. NEWTON
Thomas H. Newton, Judge

Witt, P.J., and Ellis, J. concur.

24